STATE of Maine

v.

Virgil SMITH.

Supreme Judicial Court of Maine.

Argued Dec. 6, 1995.

Decided April 22, 1996.

Andrew Ketterer, Attorney General, Peter J. Brann (orally), Assistant Attorney General, Augusta, for the State.

Matthew B. Nichols (orally), Boulos & Gardner, Saco, for Defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

DANA, Justice.

Virgil Smith appeals from judgments of conviction entered in the Superior Court (Cumberland County, *Fritzsche, J.*) following jury verdicts finding him guilty of one count of arson in violation of 17–A M.R.S.A. § 802(1)(B)(2) & 802(2) (1983) and four counts of depraved indifference murder in violation of 17–A M.R.S.A. § 201(1)(B) (1983). Smith challenges: the denial by the court (*Brennan, J.*) of his motion to suppress certain statements and physical evidence, the propriety of several evidentiary rulings made at the trial, and the court's refusal to instruct the jury on alternative suspects. He also alleges instances of prosecutorial misconduct. We affirm the judgments.

The following facts were adduced at the trial. In 1989 Smith met Stacie Richards and they commenced a romantic relationship. Richards became pregnant by Smith in December 1990 and they moved in together. At some point the relationship between Richards and Smith began to deteriorate, primarily due to Smith's increasing jealousy. Richards and their daughter moved out in October 1992 and went to live with her father, Michael Pooler, at 215 Congress Street in Portland.

Smith continued to either visit or phone Richards on a daily basis. They discussed getting back together, but Richards repeatedly told Smith it was not a good idea. When Smith visited he drove his mother's gray Chrysler Lebaron, which had no muffler and was noisy.

About one month before the fire Smith seemed increasingly upset. He continued to visit Richards, despite her requests to be left alone, and they argued. During these arguments Smith threatened to "blow up the . . . building," kill Pooler, take their daughter away, or kill himself.

The day before the fire Smith instructed his sister to telephone the Department of Human Services, pretend she was Richards, and tell them she no longer needed her food stamps or child support payments because she was moving to Colorado. On the same day Smith called the police to complain of Richards's alleged neglect of their daughter and repeated his threat to blow up 215 Congress Street. Both Richards and Pooler saw and heard Smith driving near 215 Congress Street on the day before the fire.

The night before the fire Smith told Richards's grandmother that he was going to throw a brick through Pooler's window. He also threatened to shoot Richards's kneecaps off and to hire a hit man to kill Pooler and everyone else in the building except Richards.

At about 2:00 a.m. on the day of the fire Leslie Hoffstadt, a resident of 215 Congress Street, left the building noting nothing suspicious. When he returned an hour later, however, he noticed a slippery green-blue-gray substance in a zig-zag pattern on the carpeted stairs inside the entryway and surmised that it was oil. Later Hoffstadt heard a loud crash and went downstairs to investigate. He found that someone had thrown a brick through the glass security door. When Hoffstadt, his fiancee, and the building superintendent proceeded to clean up the oily substance and the broken glass they noticed smoke in the hallway.

At about 5:20 a.m. a resident of an adjacent building smelled gasoline and heard a car with a loud exhaust in the parking lot shared by the two buildings. A few minutes later she saw that the back of 215 Congress Street was in flames and called the fire department. The fire department arrived with-

in minutes and saw dark smoke coming from the building. Several minutes later flames came out a window near the top of the building and then the upper portion of the building exploded. Four people died in the fire.

Detective Young, a fire investigation expert from the Portland Police Department, arrived on the scene at 6:04 a.m. He concluded that the fire had been set using an oil-based accelerant. Pooler told him that Smith had threatened to burn the building about a week earlier and that he had seen and heard Smith's mother's car in the area the evening before the fire. Detective Young asked Officer Leadbetter to locate the car and detain Smith if he appeared.

Officer Leadbetter located the car that morning at Smith's address. Within minutes Smith appeared, walked toward the car, and opened the door. Officer Leadbetter approached Smith, advised him he was being detained in connection with an investigation of the fire at 215 Congress Street and put him in the back of his cruiser.

Officer Leadbetter asked Smith a few questions with regard to the fire. He did not give Smith the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When Detective Young arrived one-half hour later, he introduced himself, informed Smith that he was in custody but not under arrest, and gave him the *Miranda* warnings. After each warning Smith said that he understood. During the recitation Smith appeared to Detective Young to be calm and to clearly understand what was being read to him; he did not appear intoxicated. Afterwards Smith agreed to speak with him about his whereabouts on the previous evening.

Smith admitted threatening Richards and summoning the police to Richards's apartment to check out possible neglect of their daughter. He denied burning the building. After ten minutes of questioning Smith consented, in writing, to a search of his person and his apartment for evidence relating to the fire.

Inside Smith's apartment complex a dog trained to detect hydrocarbons made a positive indication for them on Smith's right sneaker. Detective Young arrested Smith, seized his sneakers, and took him to police headquarters for questioning. By the time Detective Young was able to resume the questioning of Smith, approximately two and one-half hours had passed since he had been given his *Miranda* warnings. Before Detective Young started questioning Smith at the station he reminded Smith of the substance of his *Miranda* rights and that those rights were still in effect, but he did not repeat the warnings in full. Detective Young also seized the clothing that Smith was wearing after he finished questioning him.

Prior to trial Smith filed a motion to suppress all oral statements and physical evidence obtained before and after he was advised of his *Miranda* rights. The court granted Smith's motion to suppress as to those statements made by Smith to Officer Leadbetter prior to being read his *Miranda* warnings, but denied the motion in all other respects.

Smith also filed a motion *in limine* challenging the admissibility of: testimony by various witnesses that Smith had made threats against Richards in the weeks prior to the fire, testimony by various witnesses that Smith was carrying a police scanner on the night preceding the fire, and testimony by various witnesses regarding Smith's mental and emotional condition including his suicide attempts. The court granted the motion with respect to the suicide attempts but otherwise denied Smith's motion.

The jury returned verdicts of guilty to the arson charge and the depraved indifference murder charges, and not guilty to two attempted murder charges.

## I. MOTION TO SUPPRESS

■ Smith contends that the motion court erred in denying his motion to suppress. As a legal conclusion drawn from uncontroverted facts the Superior Court's suppression ruling is independently reviewable on appeal. *State v. Dube*, 655 A.2d 338, 340 (Me.1995).

### A. Probable Cause for Arrest.

■ Smith argues that Officer Leadbetter did not have probable cause to detain or

arrest him on the morning of the fire. Although Officer Leadbetter may not have had probable cause to believe that criminal conduct had taken place at the hands of Smith, Detective Young did. The record demonstrates that when he dispatched Officer Leadbetter to find Smith's car and detain him if he appeared, Detective Young had observed or learned the following things: the black smoke and progression of the fire indicated the presence of an accelerant; there was an oily substance on the first floor stairs; a brick had been thrown through the front door; a neighbor had reported smelling gasoline; Smith had threatened to burn the apartment complex down; Smith's former girlfriend and child lived in the building; a resident of the building had seen and heard what he believed to be Smith's car the night before the fire; and Detective Young had been given a description of Smith and the vehicle he drove. Together these pieces of information were sufficient to give Detective Young a basis for detaining or arresting Smith.

### B.  Fruit-of-the-poisonous-tree Exclusionary Rule.

■ The suppression court granted Smith's motion to suppress the statements he made to Officer Leadbetter on the ground that those statements were taken in violation of the defendant's right to *Miranda* warnings. Smith argues, however, that those statements fatally tainted *all* subsequent statements made by him and *all* physical evidence seized while he was in police custody even though he was ultimately given proper *Miranda* warnings by Officer Young. Accordingly, he contends that the court should have granted his motion to suppress all statements he made and all evidence gathered after the *Miranda* warnings.

■ In support of his argument Smith relies on *Wong Sun v. United States,* 371 U.S. 471, 485–88, 83 S.Ct. 407, 416–18, 9 L.Ed.2d 441 (1963), in which the United States Supreme Court held that evidence and witnesses discovered as a result of a search violating the fourth amendment must be excluded. The *Wong Sun* doctrine also applies when the fruit of the fourth amendment vio-

lation is a confession. *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985). The purpose behind the *Wong Sun* "fruit-of-the-poisonous-tree" exclusionary rule is "to deter unreasonable searches, no matter how probative their fruits." *Id.*

■ The facts of this case, however, do not implicate the fourth amendment or any other constitutional rights *per se.* What Smith complains of is not a constitutional violation itself, but rather a failure on the part of the police to give the prophylactic *Miranda* warnings when they should have. Smith does not argue that Officer Leadbetter's failure to give a *Miranda* warning resulted in an actual violation of his fifth amendment rights. A failure to issue the requisite *Miranda* warning does not necessarily equate to a constitutional violation, therefore the admissibility of statements made after a subsequent warning turns *only* on whether the defendant knowingly and voluntarily made those statement(s). *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293.

The facts do not indicate anything coercive about the circumstances in which Smith was interrogated by the police: he was not subjected to physical violence nor did the police use any other deliberate means to wear him down to the point of answering their questions or offering information. *See id.* at 312, 105 S.Ct. at 1294–95. Absent a showing of coercion or improper tactics on the part of the police, Detective Young's administration of proper *Miranda* warnings cured the assumed element of compulsion that accompanied Smith's earlier statements to Officer Leadbetter. *Id.* at 314, 105 S.Ct. at 1296. The statements that Smith made to the police after the *Miranda* warnings are admissible and the court did not err in denying Smith's motion to suppress in this regard. For the same reasons the tangible evidence seized after the *Miranda* warnings was also properly admissible.

### C.  Failure to Give a Second Full *Miranda* Warning.

■ Smith contends that the statements he made in response to his interrogation at the police station should have been sup-

pressed because he did not receive a second full *Miranda* warning prior to that interrogation. The test we have articulated for determining when an accused is entitled to have his *Miranda* warnings readministered requires a balancing of the following five factors: (1) the time lapse between the last *Miranda* warnings and the accused's statements; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the accused's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the accused's statement; and (5) whether the statement elicited during the complained of interrogation differed significantly from other statements that had been preceded by *Miranda* warnings. *State v. Myers*, 345 A.2d 500, 502 (Me.1975). Our analysis of the five factors set forth in *Myers* compels the conclusion that a second full *Miranda* warning was not required and that Smith's responses to Detective Young's questioning at the police station were offered voluntarily and with " 'full knowledge of his legal rights [and having] knowingly and intentionally relinquish[ed] them.' " *Id.* at 502 (quoting *Miller v. United States*, 396 F.2d 492, 496 (8th Cir.1968), *cert. denied*, 393 U.S. 1031, 89 S.Ct. 643, 21 L.Ed.2d 574 (1969)).

## II. EVIDENTIARY OBJECTIONS

Smith argues that the trial court erred in excluding evidence that following the fire Hoffstadt, a prosecution witness, was convicted of unlawful sexual contact against a little girl who lived at 215 Congress Street.[1] Smith's stated purpose in offering this evidence was to impeach Hoffstadt and to suggest that he may have had a motive for setting the fire. Initially the court ruled that both Hoffstadt's conviction and the fact that his victim lived at 215 Congress Street were admissible. When the State brought to the court's attention that Hoffstadt was acquitted of the charge that took place at 215 Congress

Street, the court ruled that only Hoffstadt's conviction was admissible.

A criminal defendant is entitled to present evidence supporting his theory that another person is responsible for the crime with which he is charged. *State v. Dechaine*, 572 A.2d 130, 134 (Me.1990) (citing *State v. Harnish*, 560 A.2d 5, 9 (Me.1989)), *cert. denied*, 498 U.S. 857, 111 S.Ct. 156, 112 L.Ed.2d 122 (1990). Evidence of where Hoffstadt's commission of unlawful sexual contact took place is properly viewed as "alternative perpetrator" evidence because the purpose of the evidence was to establish that Hoffstadt had a motive for committing the arson. Alternative perpetrator evidence must be admitted if it is of "sufficient probative value to raise a reasonable doubt as to the defendant's culpability." *State v. Conlogue*, 474 A.2d 167, 172 (Me.1984). For alternative perpetrator evidence to have sufficient probative value to raise a reasonable doubt as to the defendant's culpability "it must be more than speculative and conjectural." *Dechaine*, 572 A.2d at 134. The evidence incriminating the other person must be " 'competent and confined to substantive facts which create more than a mere suspicion that the other person committed the [crime]. . . .' " *Id.* (quoting *Fortson v. State*, 269 Ind. 161, 379 N.E.2d 147, 153 (1978)).

In the instant case the fact that Hoffstadt would be subsequently charged with unlawful sexual contact that allegedly took place at 215 Congress Street was not sufficient to create more than speculation and conjecture that Hoffstadt was guilty of the crimes that Smith was convicted of. At the time of the fire Hoffstadt had not been indicted. Thus he could not have had revenge in mind. Moreover, because of the timing of the indictment in relationship to the fire it is also unlikely that Hoffstadt was thinking about destruction of evidence. The fact that Hoffstadt was subsequently charged with an episode of sexual contact at 215 Congress Street therefore is precisely the kind of speculative

---

**1.** Five months after the fire Hoffstadt was indicted on three counts of unlawful sexual contact against the little girl. The third count was dismissed prior to trial and Hoffstadt was acquitted on the first and found guilty on the second. The first count related to an episode that took place at 215 Congress Street before the fire; the second count on which he was convicted related to an episode that occurred after the fire at the girl's new home.

and conjectural evidence that should *not* be admitted pursuant to the rubric "alternative perpetrator" evidence. The court did not abuse its discretion in excluding this evidence. *State v. Robinson,* 628 A.2d 664, 666 (Me.1993) (decision to admit or exclude evidence is reviewed for an abuse of discretion).

Smith's other contentions regarding the propriety of several evidentiary rulings and the State's alleged discovery violation are without merit.

## III. PROSECUTORIAL MISCONDUCT

■ On cross-examination the defense elicited testimony from a firefighter about a false fire alarm that was sounded at 215 Congress Street approximately two weeks before the fire and that although the alarm was successfully reset, the pull station on the first floor was in need of repair. On redirect the State elicited testimony that the condition of the fire alarm was the subject of ongoing litigation. Subsequently, when a different firefighter was on the stand the State asked him whether he "believe[d] that the person who set this fire ought to get the benefit of the condition of the alarms?" Smith objected to this question and the court sustained the objection. The witness did not answer.

■ Smith contends that the asking of this question amounted to prosecutorial misconduct because it was aimed at eliciting inadmissible opinion evidence. Prosecutors have a duty to avoid eliciting inadmissible testimony. *State v. Hinds,* 485 A.2d 231, 235 (Me.1984); *State v. Gaudette,* 431 A.2d 31, 34 (Me.1981). If a prosecutor fails to observe this duty he is guilty of prosecutorial misconduct and such misconduct *may* be sufficient to warrant a mistrial. See *Gaudette,* 431 A.2d at 34–35; *State v. Thornton,* 414 A.2d 229, 235 (Me.1980); *State v. Edwards,* 412 A.2d 983, 987 (Me.1980).

■ Assuming, *arguendo,* that the State's purpose in asking this question was to elicit opinion evidence that is inadmissible

pursuant to M.R.Evid. 701,[2] the court's decision not to grant Smith's request for a mistrial was well within its discretion. *Hinds,* 485 A.2d at 235 (stating that trial courts have broad discretion in deciding whether prosecutorial misconduct requires a mistrial). Because of "the superior vantage point of the justice presiding at a trial," we review a refusal to grant a mistrial only for an abuse of discretion. *State v. Herbest,* 551 A.2d 442, 444 (Me.1988). Thus we will only overrule such a refusal for exceptionally prejudicial circumstances or prosecutorial bad faith. *State v. Jones,* 523 A.2d 579, 581 (Me.1987).

Smith does not argue that the prosecution was motivated by bad faith in asking the question. He does contend, however, that the question resulted in unfair prejudice to him. We disagree. The trial justice sustained Smith's objection to the question and the witness never answered. Moreover, there was overwhelming evidence presented at trial tending to implicate Smith. In these circumstances the mere asking of this question did not result in exceptional prejudice to Smith that would require the court to declare a mistrial.

Smith's allegations of prosecutorial misconduct during the State's closing argument are without merit.

## IV. ALTERNATIVE SUSPECT JURY INSTRUCTION

■ Smith contends that the trial court erred in refusing to give the jury an instruction on alternative suspects because, he alleges, the evidence was sufficient to support such an instruction. As authority for this argument Smith relies on *State v. Cumming,* 634 A.2d 953, 957 (Me.1993), in which we held that a trial court must instruct the jury on a defense whenever it determines that the evidence is legally sufficient to support it.

■ Smith is correct that a criminal defendant is entitled to an instruction on his theory of the case when that theory has rational support in the evidence. *State v.*

2. M.R.Evid. 701 provides:
    If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

*Knowles,* 495 A.2d 335, 338 (Me.1985). Accord, *State v. Larrivee,* 479 A.2d 347, 350 (Me.1984); *State v. Bahre,* 456 A.2d 860, 866 (Me.1983); *State v. Rand,* 430 A.2d 808, 815 (Me.1981); *State v. Carmichael,* 405 A.2d 732, 736 (Me.1979). We have said that "[a] defense is generated to the point where a jury instruction is needed when a defendant has met his burden of going forward with evidence of such nature and quality as to raise the issue and justify a reasonable doubt of guilt." *Larrivee,* 479 A.2d at 350.

When Smith requested a jury instruction on alternative suspects he conceded that the only rational evidence that existed in support of that defense was evidence linking two youths to the vandalism of the glass door in the entryway of 215 Congress Street. Detective Young testified that he investigated the youths' possible involvement in the setting of the fire and eliminated them as suspects. They testified that they had nothing to do with the setting of the fire, there was no evidence connecting either to anyone who lived at 215 Congress Street, and nothing to suggest that they had a motive to set the fire. Given the totality of this evidence it was not of a nature and quality to justify reasonable doubt as to Smith's guilt. *See Larrivee,* 479 A.2d at 350. Accordingly, the court did not err in denying the requested instruction.

The entry is:

Judgments affirmed.

All concurring.