1997 ME 141

**STATE of Maine**

v.

**Robert ARDOLINO.**

Supreme Judicial Court of Maine.

Argued May 12, 1997.

Decided June 30, 1997.

Andrew Ketterer, Attorney General, Donald W. Macomber (orally), William R. Stokes, Asst. Attys. General, Augusta, for State.

Peter L. Murray, Stuart W. Tisdale, Jr., Daniel G. Lilley, Mary A. Davis, Portland, for defendant.

Before GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

GLASSMAN, Justice.

[¶ 1] Robert Ardolino appeals from the judgment entered in the Superior Court (Penobscot County, *Kravchuk, J.*) on a jury verdict finding him guilty of depraved indifference murder in violation of 17–A M.R.S.A. § 201(1)(B) (1983).[1] He contends that the trial court erred by (1) denying his motion for a bill of particulars, (2) certain of its evidentiary rulings, and (3) denying his motion for a judgment of acquittal. He also contends that the State committed prosecutorial misconduct in its summation and that it was a misapplication of principle for the trial court to impose a sentence greater than twenty-five years. We affirm the judgment and the sentence.[2]

[¶ 2] The record reveals the following undisputed facts: Matthew, born October 3, 1983, and Daniel, born July 13, 1981, had

---

1. 17–A M.R.S.A. § 201(1)(B) provides:
    1. A person is guilty of murder if:
        ....
        B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being....

2. Ardolino was also charged with recklessly or with criminal negligence causing the death of Matthew Ardolino in violation of 17–A M.R.S.A. § 203(1)(A) (Supp.1996).

resided exclusively with Ardolino from the date of the separation of their parents, Robert Ardolino and Nan Ardolino, in February 1992. In the early morning hours of June 27, 1993, Matthew died from a massive abdominal infection resulting from a delayed rupture of his intestine that occurred approximately twenty-four hours before his death. The rupture was caused by trauma to his abdomen that could have occurred within twenty-four hours of the rupture and within forty-eight hours of his death. At approximately four o'clock in the morning of June 27, Daniel was awakened by Ardolino, with whom he was sharing a downstairs bedroom, and told to check on Matthew who had retired to an upstairs bedroom. Daniel discovered Matthew's body, covered with a blanket, on the sofa in the living room.

[¶ 3] The August 10, 1994, indictment charging Ardolino with the death of Matthew stated:

> On or about June 27, 1993, in the County of Washington, State of Maine, Robert Ardolino did engage in conduct which manifested a depraved indifference to the value of human life and which did, in fact, cause the death of Matthew Ardolino, all in violation of 17-A M.R.S.A. § 201(1)(B) (1983).

Following extensive discovery pursuant to M.R.Crim.P. 16 and 16A, Ardolino filed a motion seeking a bill of particulars from the State, pursuant to M.R.Crim.P. 16(c)(1). After a hearing, the court denied his motion. At the trial, the court denied Ardolino's motions for a judgment of acquittal. The jury returned a verdict of guilty on the charged offense of depraved indifference murder. Following a hearing, the court denied Ardolino's motion for a new trial and a judgment was entered on the jury verdict,which Ardolino now appeals. Pursuant to 15 M.R.S.A. § 2152 (Supp.1996),the Sentence Review Panel of the Supreme Judicial Court granted Ardolino leave to appeal the thirty-five year sentence imposed by the trial court.

### I. Bill of Particulars

[¶ 4] Ardolino first contends that the trial court's erroneous denial of his motion for a bill of particulars deprived him of a fair trial. He argues, as he did before the trial court, that prior to the trial he was entitled to know the time and the precise nature of his conduct allegedly causing Matthew's death, which he was unable to discern from the language of the charge or the voluminous discovery materials provided to him by the State. We disagree.

[¶ 5] M.R.Crim.P. 16(c)(1) provides:

> The court for cause may direct the filing of a bill of particulars if it is satisfied that counsel has exhausted the discovery remedies under this rule or it is satisfied that discovery would be ineffective to protect the rights of the defendant. The bill of particulars may be amended at any time subject to such conditions as justice requires.

"The purpose of a bill of particulars is to enable the defendant to prepare an adequate defense, to avoid prejudicial surprise at trial, and to establish a record upon which to plead double jeopardy if necessary." *State v. Cote*, 444 A.2d 34, 36 (Me.1982) (citing *State v. Larrabee*, 377 A.2d 463, 465 (Me.1977)). Because a motion for a bill of particulars is addressed to the discretion of the trial court, we review the denial of the motion for an abuse of that discretion. *Id.* In considering whether the court properly denied the motion, we examine the record to determine what facts were known to the defendant prior to the trial. *Id.* We have previously noted that it is not the function of a bill of particulars to disclose in detail the evidence on which the State will rely at the time of the trial or to disclose the theory on which the State will proceed at the trial. *State v. Hickey*, 459 A.2d 573, 581 (Me.1983).

[¶ 6] In the instant case, the record discloses that on the date of the hearing on his motion for a bill of particulars, approximately one year prior to the trial of this case, Ardolino had a copy of the indictment setting forth the charge against him[3] and a volumi-

---

3. We have previously held that an indictment worded in the general language of the depraved indifference murder statute containing the "name of the victim and the date the offense was alleged to have occurred" is constitutionally sufficient to sustain a subsequent conviction. *State v. Crocker*, 435 A.2d 58, 68 (Me.1981).

nous amount of discovery material that disclosed, *inter alia,* Matthew had died as a result of acute peritonitis resulting from a blunt force trauma to his abdomen on either June 24 or 25, 1993; Ardolino was the sole adult caretaker of Matthew on those dates; Ardolino was verbally and physically abusive to Matthew, including blows to his abdomen with his fist, his foot and with a baseball bat both *before* and *after* those dates; when angry with the children during such periods he charged them with being "just like your mother"; on the morning of June 26, a witness, who was clamming on mud flats near the Ardolino residence where Ardolino and the children were also clamming, heard Ardolino yelling and cursing at Matthew about lying and stating, "if you don't stop your effing lying to me, I'll shut you up for good"; Matthew's body was covered with more than one hundred bruises and abrasions of varying ages, including bruises on his stomach, chest, left side and hip, of which Ardolino was aware; there was no evidence of a non-criminal agency to explain the injury to Matthew's abdomen; Ardolino was aware that Matthew was lethargic and vomiting bile on June 26, 1993, and did not seek medical treatment for him. In addition, Ardolino had a copy of his statements relating to the discovery of Matthew's body and that Daniel had told him Matthew had fallen from a tree or tree house the day before his death.

[¶ 7] At the hearing on Ardolino's motion, the State advised the court that it would be relying on circumstantial evidence to establish that on June 24 or 25 Ardolino struck the fatal blow to Matthew's abdomen and that it lacked knowledge of the specific time or nature of the death-causing blow by Ardolino. Based on this record, we cannot say the trial court abused its discretion when determining that Ardolino had failed to show cause for the State to file a bill of particulars.

II. *Evidentiary Issues*

A. *Allegations of sexual abuse*

[¶ 8] Ardolino contends that it was an abuse of the trial court's discretion to admit

evidence, over his objection, that he had manipulated Daniel and Matthew to lodge false claims of sexual abuse against their mother and grandfather. Although Ardolino's objection to the evidence at the time of the trial was on the ground that it was irrelevant, he now argues that it was improper character evidence in violation of M.R. Evid. 404(b) and that, pursuant to M.R. Evid. 403, the evidence should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice to him.[4] We disagree.

[¶ 9] M.R.Evid. 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." We have previously stated that evidence of other acts "is admissible when offered to prove something other than that the defendant was acting in conformity with a character trait elucidated by such and when not deemed more prejudicial than probative by the trial [court]." *State v. Lindsey,* 447 A.2d 794, 795 (Me.1982). *See, e.g., State v. Huntley,* 681 A.2d 10, 13 (Me.1996) (uncharged sexual acts admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident); *State v. Valentine,* 443 A.2d 573, 578 (Me.1982) (evidence of prior beating of murder victim by defendant admissible to show intent); *State v. Silva,* 153 Me. 89, 98, 134 A.2d 628, 632 (1957) (evidence of old abnormal injuries admissible to rebut defendant's claim of accident). See also Field & Murray, *Maine Evidence* § 404.4 at 128 (4th ed. 1997) ("The list of purposes for which prior acts evidence may be admitted is not exhaustive, nor is it conclusive. The factors in each case are so varied that no verbal formula can be applied with precision."); McCormick, 1 *McCormick on Evidence* § 190 at 799–800 (4th ed.1992) (evidence of other crimes admissible to "complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings . . . . [t]o prove the existence

---

4. Prior to the trial, and following a hearing, the court denied Ardolino's motion *in limine* seeking to exclude all evidence relating to the sexual abuse allegations. Ardolino twice moved for a

reconsideration of this ruling by the court. The court denied the motions, stating it would give a limiting instruction to the jury on any "prior bad act" evidence.

of a larger plan, scheme, or conspiracy, of which the crime on trial is a part.").

[¶ 10] M.R.Evid. 403 provides, in pertinent part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." As we have previously stated, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *State v. Forbes,* 445 A.2d 8, 12 (Me.1982) (quoting *State v. Hurd,* 360 A.2d 525, 527 n.5 (Me.1976)). We review for an abuse of the court's discretion both its admission of evidence of prior bad acts, *State v. Connors,* 679 A.2d 1072, 1074 (Me.1996), and its admission of prejudicial relevant evidence. *State v. Robbins,* 666 A.2d 85, 87 (Me.1995).[5]

[¶ 11] Here, the evidence discloses that within three weeks following the parents' separation, Ardolino forced Daniel and Matthew to copy in their own handwriting his written allegations that they had been sexually molested by their mother and grandfather. He then notified the Department of Human Services that this molestation had "just been disclosed to him." He arranged for the children to be interviewed by the Department. In his presence, he had the children make the disclosure to a physician and arranged to have the children interviewed by a Maine State Police detective. He also notified the New York Police Department, where the grandfather resided, and removed the children from school to take them to New York to be interviewed by a detective in that department. Throughout this period he was repeatedly physically and verbally abusing the children.

[¶ 12] On June 21, 1993, Ardolino was personally notified by the State Police that the children's mother would not be criminally charged with sexually abusing the children and that Ardolino might be charged with filing a false public report. He was particularly physically and verbally abusive toward Matthew from that time until the time of Matthew's death.

[¶ 13] Daniel testified the allegations were false, that the children had agreed to the false accusations "because we were afraid," that he had been able to keep the story straight when speaking to various persons because he studied the written statements, and that the allegations had been made to "get back" at his mother. The record also discloses evidence that Ardolino instructed Daniel to state that Matthew had fallen from the tree house the day prior to his death, and Daniel related this story to several investigating officers on the morning of Matthew's death. An investigation of the tree, the tree house, the surrounding area and of Matthew's clothing disclosed no physical evidence to support the story. Daniel testified he told the story because he was afraid and because "everything that Dad had told me to do before had always turned out okay, so I figured it would turn out okay."

[¶ 14] The court limited the scope of the evidence relating to the sexual abuse allegations, excluding the content of the allegations and the children's written statements. During the course of the trial and in its final instructions to the jury, the court gave an instruction as to the limited purpose of the evidence. As determined by the trial court, the evidence was probative of Ardolino's plan to harm his wife by his manipulation and control of the children and his angry state of mind immediately preceding Matthew's death on learning the plan had failed. The overall pattern of Ardolino's conduct and the familial relationship existing between Ardolino, his two children, and his wife, close in time to Matthew's death, provided evidence

---

5. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.Evid. 401. "All relevant evidence is admissible, except as limited by constitutional requirements or as otherwise provided by statute or by other rules applicable in the courts of this state. Evidence which is not relevant is not admissible." M.R.Evid. 402.

of Ardolino's state of mind and motive to behave as the State alleged he did. The evidence of Daniel's participation in lodging the sexual abuse allegations also served to put in context Daniel's different versions of Matthew's death and assisted the jury in determining Daniel's credibility. On the record before us, we conclude the trial court did not err or abuse its discretion by admitting the challenged evidence.

### B. Testimony of Sarah Falconer–Maker

[¶ 15] Ardolino contends the trial court erred by denying his motion for a mistrial following the testimony of the State's witness, Sarah Falconer–Maker. He argues that her challenged testimony coupled with the other evidence relating to the sexual abuse allegations was so prejudicial that it could not be cured by the court's instruction to disregard it. We disagree.

[¶ 16] We have previously stated that the trial court's decision whether to grant a mistrial is discretionary. *State v. Smith,* 675 A.2d 93, 99 (Me.1996). Because of the superior vantage point of the trial court, we will overrule its decision only for exceptionally prejudicial circumstances or prosecutorial bad faith. *Id.* Prosecutors have a duty to avoid eliciting inadmissible testimony, and a failure to observe this duty is prosecutorial misconduct that may be sufficient to warrant a mistrial. *Id.* "The trial court should deny a motion for a mistrial except in the rare case when the trial cannot proceed to a fair result and no remedy short of a new trial will satisfy the interests of justice." *State v. Mason,* 528 A.2d 1259, 1260 (Me.1987).

[¶ 17] Here, the record reflects that before the State called the witness, a secretary in the Machias office of the District Attorney in March 1993, the court cautioned the State that she was not to testify that Ardolino had scared or intimidated her. On direct examination, following her testimony that she had no personal contact with Ardolino but had answered telephone calls from him on several occasions when he inquired as to the status of the investigation of the sexual abuse charges against his wife, the following colloquy occurred:

[State]: What was his tone of voice when you would speak to him?

[Witness]: First couple of times he was pretty—his manner was fine. I think it was the third phone call and I instructed him, you know, this is where it is, it's been assigned, I don't know who it's been assigned to. And he wasn't satisfied with that and he told me that he would come down and take care of us with a 20–20.

[¶ 18] Ardolino objected to this response and moved for a mistrial. The court denied the motion but immediately instructed the jury, *inter alia,* to disregard the last statement of the witness and directed that the statement be stricken from the record. The statement of the witness was not responsive to the inquiry of the State. We have previously stated that the trial court's determination of whether exposure to potentially prejudicial extraneous evidence would incurably taint the jury verdict or whether a curative instruction would adequately protect against consideration of the matter stands unless clearly erroneous. *State v. Mason,* 528 A.2d at 1260–1261. We also must presume that the jury heeds the court's instruction. *State v. Herbest,* 551 A.2d 442, 445 (Me.1988). Giving fair deference to the trial court's decision in the instant case, we conclude that there was no clear error or an abuse of discretion in the trial court's denial of Ardolino's motion for a mistrial.

### III. Sufficiency of the Evidence

[¶ 19] Ardolino contends the trial court erred by denying his motions for a judgment of acquittal. He argues that to meet its burden of proof on a charge of depraved indifference murder, the State must establish the specific death-causing action so the objective test for the precise risk-producing potential of the action may be applied by the factfinder. We disagree.

[¶ 20] A person is guilty of depraved indifference murder if that person "engages in conduct which manifests a de-

praved indifference to the value of human life and which in fact causes the death of another human being." 17–A M.R.S.A. § 201(1)(B). Section 33 provides:

> Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient.

17–A M.R.S.A. § 33 (1983). "The standard to be applied to determine whether evidence is sufficient to support a jury's conviction is whether, based on that evidence viewed in the light most favorable to the prosecution, any trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Barry,* 495 A.2d 825, 826 (Me.1985). A conviction may be grounded on circumstantial evidence and is not for that reason less conclusive. *State v. Benner,* 654 A.2d 435, 437 (Me.1995). "The factfinder is allowed to draw all reasonable inferences from the circumstantial evidence." *Id.* The law is well established that it is the duty of the factfinder to reconcile conflicting testimony, determine its relative weight and decide what part of the testimony is credible and worthy of belief. *Id.* In *State v. LeClair,* we stated:

> When the state produces circumstantial evidence tending to support an inference of the defendant's guilt, the jury must also consider, of course, any explanation for the evidence consistent with the defendant's innocence. The jury's guilty verdict must be based not on a determination that there exists no alternative explanation, but that, after assessing the credibility of such explanations, they raise no reasonable doubts as to the defendant's guilt.

■ 425 A.2d 182, 184 (Me.1981). "[T]he reasonable doubt which will prevent conviction must be the fact finder's doubt and not that of an appellate court." *State v. Bonney,* 351 A.2d 107, 110 (Me.1976) (citation omitted).

[¶ 21] Applying these principles to our review of the record in this case, we conclude the jury properly could have found that the circumstances, viewed in relation to each other and together with the rational inferences that could be dawn from them, satisfied the State's burden of proof that every element of the charged offense had been proven beyond a reasonable doubt. Accordingly, we find no error in the trial court's denial of Ardolino's motions for a judgment of acquittal.

### IV. *State's Closing Summations*

■ [¶ 22] Our review of the record discloses no merit in Ardolino's contention that, notwithstanding his failure to object, the State's closing summations were so egregious as to deprive him of a fair trial. When, as here, the State based its summation on facts and testimony in evidence and the reasonable inferences that could be drawn therefrom, it was not error to argue its analysis of the evidence for any position or conclusion with respect to those matters. *State v. Harnish,* 560 A.2d 5, 9 (Me.1989).

### V. *Sentence*

■ [¶ 23] Ardolino finally contends that it was a misapplication of sentencing principles for the trial court to sentence him to any term of years greater than the statutorily mandated sentence of twenty-five years. He argues that the court's determination of a basic period of incarceration of forty-five to fifty years rather than a definite term made uncertain the specific number of years the court deducted for mitigating factors and that, in any event, the mitigating factors required reduction of the basic period of incarceration to twenty-five years. We disagree.

■ [¶ 24] A sentence for murder may range from the mandatory minimum period of twenty-five years incarceration to life imprisonment. 17–AM.R.S.A. § 1251 (Supp. 1996). The three-step sentencing process by the trial court set forth in *State v. Hewey,* 622 A.2d 1151 (Me.1993), is codified at 17–A M.R.S.A. § 1252–C (Supp.1996) for murder, Class A, Class B or Class C crimes. We review de novo the first step of the process for a misapplication of principle in the trial

court's determination of the basic period of incarceration. We have previously stated that in reaching its determination the trial court is to compare the defendant's conduct "on a scale of seriousness against all possible means of committing the crime in order to determine which acts deserve the most punishment," *State v. Lilley*, 624 A.2d 935, 936 (Me.1993), and the basic period of incarceration imposed for similar conduct of other offenders convicted of offenses within the same classification. *State v. Bolduc*, 638 A.2d 725, 727 (Me.1994).

[¶ 25] Here, the record reflects the trial court determined that a life sentence was not appropriate after concluding the factors set forth in *State v. Shortsleeves*, 580 A.2d 145, 149–50 (Me.1990), justifying a life sentence, were not present in the instant case. The court found the case of *State v. Crocker*, 435 A.2d 58 (Me.1981), to be analogous on its facts in that it involved the depraved indifference murder by a stepparent of a five-year-old boy, but noted that the extreme cruelty inflicted on the child prior to his death that justified the life sentence in that case was not present in the instant case. The court's determination that the "type of outrageous conduct, as the jury has found, inflicted over a period of time, including additional blows after the death-producing blow itself was inflicted," justified a basic period of incarceration in the forty-five to fifty-year range cannot be said to be a misapplication of principle; nor does the stating of the basic period of incarceration within a five-year range require a vacation of the sentence.[6]

[¶ 26] The next two steps of the sentencing process, the determination of the maximum period of incarceration and what portion, if any, of that period should be suspended in arriving at the final sentence imposed, we review for an abuse of the trial court's discretion. *State v. Hewey*, 622 A.2d at 1155. The record reflects the court considered "all other relevant sentencing factors, both aggravating and mitigating, appropriate to [the] case .... includ[ing] ... [but not] limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest." 17–A M.R.S.A. § 1252–C(2).

[¶ 27] The court rejected the State's contention that Ardolino's lack of remorse should be considered an aggravating factor, stating that the fact that Ardolino did not testify on his own behalf and had entered a plea of not guilty to the charges would not be construed by the court as a lack of remorse. It also rejected Ardolino's contention that the maximum period of incarceration should be twenty-five years, stating that to do so would minimize his conduct of repeated blows to Matthew and the fact that medical treatment was not obtained. The court, as it must, also considered the statutory allowance for good time deductions from the period of the final sentence imposed. 17–A M.R.S.A. § 1252–B (Supp.1996). We find no abuse of the court's discretion in its determination, considering the mitigating and aggravating factors, that an appropriate final sentence to impose on Ardolino was thirty-five years.

The entry is:

Judgment affirmed. Sentence affirmed.

---

6. The record reflects that at the time of the sentencing proceeding Ardolino made no objection to the court's statement that it was fixing the basic period of incarceration between forty-five to fifty years.