2005 ME 74

**STATE of Maine**

v.

**Santanu BASU.**

Supreme Judicial Court of Maine.

Argued: Feb. 16, 2005.

Decided: June 20, 2005.

fact," and if consolidation would be convenient to the parties and advance the interests

of justices. M.R. Prob. P. 42.

G. Steven Rowe, Atty. Gen., Donald W. Macomber, Asst. Atty. Gen. (orally), Augusta, for the State.

Neale A. Duffett (orally), Cloutier, Barrett, Cloutier & Conley; Karen A. Dostaler, Portland, for the defendant.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Santanu Basu appeals from a judgment of conviction for murder entered in the Superior Court (Cumberland County,

Warren, J.) following a jury trial. Basu contends (1) that the court improperly denied his motion to suppress physical evidence because the search warrants were deficient; (2) that his motion to suppress statements should have been granted because the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not complied with, and because the statements were not voluntary; (3) that insufficient evidence exists to support his conviction; and (4) that the court erred in imposing his sentence and in ordering him to pay restitution. We are unpersuaded by Basu's contentions and affirm the conviction. Except for a defect in the order of restitution, which can be corrected on remand, we affirm the sentence as well.

## I. BACKGROUND

[¶ 2] On April 4, 2002, Basu was indicted for intentionally or knowingly causing the death of Azita Jamshab pursuant to 17-A M.R.S.A. § 201(1)(A) (Supp.2004). Basu pleaded not guilty, and prior to trial, moved to suppress evidence obtained from search warrants authorizing searches of his home, offices, vehicle, pager, and cell phone, and to suppress statements made to police during a videotaped interview at the Maine State Police barracks in Gray. The court denied the suppression motion dealing with evidence obtained from the searches. The court granted the motion to suppress Basu's statements in part, admitting the statements made during the interview to the point when Basu invoked his right to an attorney, and suppressing all statements made thereafter.

[¶ 3] Basu's jury trial was conducted in September of 2003. Viewed in the light most favorable to the State, the jury could have found the following facts: Basu was born in India and came to the United States in 1972. He was raised by his

grandparents, and served in the United States Navy after attending college for a few years. After Basu's discharge from the Navy, he moved to Maine in 1993 along with his wife and child. Later, he and his wife divorced; he then remarried.

[¶ 4] On January 4, 2002, Basu, who was an insurance salesman, met with Azita Jamshab. Jamshab wanted to purchase insurance, including health and rental insurance, because she had recently been through a divorce. Basu and Jamshab discussed whether to purchase a life insurance policy. Jamshab, who immigrated to the United States from Iran, wanted to name her parents as beneficiaries on the policy. Basu informed her that because her parents lived in Iran, she needed to provide him with additional information before they could be named as beneficiaries.[1] Although being told by a co-worker that an agent should not be a named-beneficiary on a life insurance policy, Basu sold Jamshab a $100,000 life insurance policy with himself named as the primary beneficiary.[2] The contingent beneficiary listed on her policy was Ahmad Khojastehzad, known as Koji, a close friend of Jamshab.

[¶ 5] At some point after Basu's January 4 meeting with Jamshab, Basu handwrote a "to do" list, including items such as "get car rental," "pick up policy," "carry out dinner," "pillow," and "ammo." He entered this same information into his Palm Pilot. Later, Jamshab contacted Basu to tell him that she wanted to move and would need to terminate her insurance policies.

[¶ 6] On March 6, 2002, Jamshab told her co-worker that she had planned a "date" with Basu for that night. She asked her co-worker to provide a cover story for her if Koji or her ex-husband asked about her. Meanwhile, Basu contacted Eugene Flemming, whom he had met while in the Navy and who lived in Portland, to see if he would provide an alibi for him. Flemming assumed the alibi was needed because Basu was seeing another woman. Basu also rented a silver Buick LeSabre, and arranged to return it the next morning.

[¶ 7] That same night, Basu went to Jamshab's home in Westbrook shortly after 6:00 P.M. He drove her to Brunswick, and picked up take-out food. The two then went to his office in Brunswick. A janitor saw the two eating in the employee lounge at about 7:30 P.M. From his office, Basu drove Jamshab to Goose Pond Road in Cumberland. Between 8:45 P.M. and 9:30 P.M., he pulled into a gravel pit, where he shot her four times. Basu used a pillow to attempt to quiet the sound of the gun.[3] Neighbors in the area and a police officer heard what sounded like gunshots at about that time.

[¶ 8] As Basu drove away from the gravel pit, he passed a police officer who was driving in the opposite direction. The officer remembered seeing a silver car with a license plate containing "KE" or "KF."[4] Basu then parked his rental car at the rental agency, cleaned it out, and drove his Montero sport utility vehicle to meet Flemming at a pool hall. Flemming was

---

1. During the investigation, it was discovered that Jamshab had provided Basu with copies of her parents' birth certificates, which should have been enough for them to be named as beneficiaries.

2. At this time, Basu and his wife had a very large debt, including credit card debt. Additionally, the amount of Basu's paychecks had

been reduced in March 2002 from $1500 biweekly to $1000.

3. The account of the murder is drawn largely from what Basu later told Flemming.

4. Basu's rental car had a license plate numbered "7057KE."

not there, however, so Basu called Flemming at his girlfriend's mother's home around 10:00 P.M. The next day, March 7, Flemming went to Basu's office in Brunswick, where Basu told him about the events as set out above. Basu also admitted that earlier on that morning he had driven his Montero out to the gravel pit to confirm that Jamshab's body was still there. He asked Flemming to continue to provide him with an alibi.

[¶ 9] After 1:00 P.M. on March 7, Jamshab's body was discovered. She was covered with loose white stuffing or down. The police also found tire impressions from which they took castings later identified as compatible with Basu's Montero. The medical examiner preliminarily ruled that Jamshab had died from the four gunshot wounds, and the autopsy later showed that the shooter was less than two feet away.

[¶ 10] Meanwhile, Koji had called Jamshab several times on the night of March 6, and on the morning of March 7. He also contacted her co-worker three or four times. At first Jamshab's co-worker stuck with her cover story, but she finally told Koji that Jamshab had gone to dinner with Basu the night before. Eventually, Koji called the police to report that Jamshab was missing. The police also contacted Jamshab's co-worker, who informed them that Jamshab had planned to have dinner with her insurance agent, Basu.

[¶ 11] On the morning of March 8, the police interviewed Basu in his office in Portland. Basu told the police that he was supposed to have dinner with Jamshab, but that she had cancelled at the last minute, so he went to her apartment for only a brief time to discuss her policies. He claimed that he got together with Flemming in his Brunswick office, where they had take-out food. They then went to Basu's Portland office. From there, Basu said that he dropped Flemming off at his house because Flemming felt sick, and then went home.

[¶ 12] That same morning, Flemming contacted the Portland police and told them about Basu's startling confession to him. Flemming also made a taped call to Basu on behalf of the police. Based on Flemming's statement, the police located Basu's rental car, which had been re-rented to another customer. The car had stains inside which were tested for DNA; the DNA matched that of Jamshab.

[¶ 13] Later on March 8, Basu agreed to go to the Maine State Police barracks in Gray. He drove his own car to the barracks, and agreed to write a statement regarding his activities on March 6, which reflected his earlier interview with the police. After reviewing that written statement, Basu agreed to undergo a videotaped interview. Basu was informed of his *Miranda* rights. During the interview, Basu claimed that on March 6, the day of Jamshab's death, he was driving his Montero; he never mentioned the rental car. Basu was then arrested for murdering Jamshab. The police secured search warrants, and searched Basu's home, offices, vehicle, pager, and cell phone.

[¶ 14] At trial, Basu testified on his own behalf. He told a story very different from his previous statements. He claimed that Koji found Jamshab and him together, kidnapped them both, and murdered Jamshab. Further, he claimed that Koji threatened Basu's family if he told anyone about the murder. The jury found Basu guilty of murder.

[¶ 15] At Basu's sentencing hearing, the State presented a number of witnesses, including Koji, Jamshab's co-worker, and Jamshab's uncle. The State made a recommendation that Basu be sentenced to life imprisonment. Basu made a brief

statement in which he expressed remorse for making himself a beneficiary on her life insurance policy, and for any role he played in her death. He also expressed sadness that the jury did not believe his story of what really happened. The court determined a basic sentence of fifty-five years, and imposed on Basu a maximum sentence of imprisonment of sixty-two years. Basu was also ordered to pay $3542.61 in restitution for funeral expenses. Basu appeals from his conviction and was granted leave to appeal his sentence. *See* M.R.App. P. 2, 20; 15 M.R.S.A. §§ 2151–2157 (2003).

## II. DISCUSSION

### A. Motions to Suppress

#### 1. Search Warrants

[¶ 16] Basu contends that the court incorrectly denied his motion to suppress physical evidence gathered from searches of his home, offices, vehicles, pager, and cell phone, arguing that the application for the search warrants on which the warrants were based did not establish a sufficient nexus between the criminal activity, the location to be searched, and the materials to be seized. We disagree. When reviewing a denial of a motion to suppress, we review "directly the finding of the magistrate who issued the warrant." *State v. Higgins*, 2002 ME 77, ¶ 20, 796 A.2d 50, 56 (citation omitted). The issuance of a search warrant is viewed with great deference to the issuing judge. *State v. Crowley*, 1998 ME 187, ¶ 4, 714 A.2d 834, 836. Here, the affidavits provided the issuing judge a substantial basis to believe that Basu had shot Jamshab; traveled to and from his office in Portland, his office in Brunswick, and his home during the time just prior to and immediately

after Jamshab's death; and that there would be evidence of Basu's relationship with Jamshab stored on his cell phone and pager.

[¶ 17] Basu further contends that one of the warrants was not valid because it lacked the issuing judge's signature.[5] At the motion hearing, however, the trial court found as a fact that the issuing judge intended to sign the warrant. The United States Constitution, the Maine Constitution, and M.R.Crim. P. 41, all require that a warrant be "issued," but there is no specific requirement that a warrant be signed. *See* U.S. Const. amend. IV; Me. Const. art. I, § 5; M.R.Crim. P. 41(a)-(c). Although it is by far the better practice for a warrant to be signed by the issuing judge or justice, the evidence supports the court's finding here that the failure of the issuing judge to sign one of the six warrants issued was inadvertent and a mere ministerial error. Accordingly, the warrant was valid.

#### 2. Statements to Police

[¶ 18] Basu also contends that the court improperly denied his motion to suppress statements he made on his videotaped interview. Basu contends that he was in custody when he was interviewed at the police barracks in Gray, that he was not properly advised of his *Miranda* rights, that he did not knowingly and intelligently waive his right to remain silent after being informed of those rights, and that the statements were not voluntary within the meaning of *State v. Coombs*, 1998 ME 1, ¶ 10, 704 A.2d 387, 390 (holding that the State must prove voluntariness beyond a reasonable doubt). We are unpersuaded by Basu's contentions.

**5.** The judge issued a total of six warrants on that day, and signed all accompanying paperwork except the warrant to search Basu's cell phone.

[¶ 19] The record shows that Basu agreed to go to the police barracks in Gray, and traveled there by himself; that while there the police allowed him privacy so that he could telephone his wife; that he was properly informed of his *Miranda* rights; and that he clearly agreed to waive them. *See Higgins,* 2002 ME 77, ¶¶ 13–14, 796 A.2d at 54–55. The record also supports the court's finding that Basu was not subjected to police coercion, that he acted and spoke in a rational manner on the videotape, that his statements were voluntarily made, and that the admission of his videotaped statements is not in any way unfair. *See Coombs,* 1998 ME 1, ¶ 10, 704 A.2d at 390–91.

### B. Sufficiency of the Evidence

[¶ 20] Basu contends that the evidence was not sufficient to convict him of the offense. "We review the sufficiency of the evidence in a criminal case in the light most favorable to the State ... [and will] affirm the conviction if a trier of fact, acting rationally, could have found every element of the offense beyond a reasonable doubt." *State v. Sweeney,* 2004 ME 123, ¶ 15, 861 A.2d 43, 46. "The weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury." *State v. Barnard,* 2001 ME 80, ¶ 13, 772 A.2d 852, 858 (citation omitted).

[¶ 21] Pursuant to 17–A M.R.S.A. § 201(1)(A), "A person is guilty of murder if the person ... [i]ntentionally or knowingly causes the death of another human being ...." The evidence presented by the State was more than sufficient to prove the elements of intentional and knowing murder: (1) Basu made a detailed confession to his friend, Flemming; (2) his "to do" list contained information consistent with the statement made to Flemming; (3) he changed his story of what happened several times; (4) he had substantial debt and his income had been reduced; (5) he served as Jamshab's insurance agent and named himself as the primary beneficiary on her life insurance policy; (6) he arranged a secretive date with Jamshab on the night of March 6; (7) he rented a silver Buick LeSabre, which was seen by a police officer near where the victim's body was later discovered, and contained blood stains, which DNA analysis showed to be Jamshab's; and (8) tire marks matching those of Basu's Montero were found at the scene of the killing. There was more than sufficient evidence in the record to support the jury's finding that Basu is guilty of murder beyond a reasonable doubt.

### C. Sentence and Restitution

#### 1. Sentence

[¶ 22] Basu argues that both his fifty-five-year basic sentence and his sixty-two-year final sentence were not justified. Pursuant to 17–A M.R.S.A. § 1251 (Supp. 2004), "A person convicted of the crime of murder shall be sentenced to imprisonment for life or for any term of years that is not less than 25." [6] When sentencing a person for murder, the court must employ a process first introduced in *State v. Hewey,* 622 A.2d 1151 (Me.1993), and codified in 17–A M.R.S.A. § 1252–C (Supp. 2004). Pursuant to subsections one and two of section 1252–C the court must decide a sentence by first determining "a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender," and next determining "the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors,

---

**6.** In *State v. Shortsleeves,* 580 A.2d 145 (Me. 1990), we held that premeditation in fact is sufficient reason to impose a life sentence for murder. *Id.* at 149–50.

both aggravating and mitigating, appropriate to that case." 17-A M.R.S.A. § 1252-C(1), (2).

[¶ 23] We review the basic term of imprisonment imposed by the sentencing court for misapplication of principle. *State v. Sweet,* 2000 ME 14, ¶ 14, 745 A.2d 368, 372. Such a review is made de novo. *State v. Ardolino,* 1997 ME 141, ¶ 24, 697 A.2d 73, 80-81. It is not enough, however, that a different sentence may have been imposed because a basic term of imprisonment will not be overturned unless the court appeared to "err in principle." *State v. Hallowell,* 577 A.2d 778, 781 (Me.1990). When deciding upon the basic sentence, the sentencing court may consider, both "the defendant's conduct on a scale of seriousness against all possible means of committing the crime ... and the basic period of incarceration imposed for similar conduct of other offenders convicted of offenses within the same classification." *Ardolino,* 1997 ME 141, ¶ 24, 697 A.2d at 80-81 (citation omitted).

[¶ 24] We review "the sentencing court's assessment of mitigating and aggravating factors for an abuse of discretion." *State v. MacDonald,* 1998 ME 212, ¶ 17, 718 A.2d 195, 200. Deference is particularly appropriate given the sentencing court's "superior posture for evaluating evidence of the circumstances of the offender." *Hewey,* 622 A.2d at 1155. "The [sentencing] court has wide discretion to balance mitigating and aggravating fac-

tors." *State v. Fleming,* 644 A.2d 1034, 1037 (Me.1994).

[¶ 25] In considering the nature and seriousness of this crime, the court observed that Basu acted in a premeditated manner and for pecuniary gain.[7] The court also found that because of the nature of her wounds, Jamshab at some point "knew that she was being attacked." Considering the above-stated factors, as well as when compared with cases of similar crimes and methods, the imposition of a fifty-five-year basic sentence is not error. *See generally State v. Small,* 2003 ME 107, 830 A.2d 423 (imposing a sixty-year sentence for a premeditated murder-for-hire for pecuniary gain); *State v. Barnes,* 2004 ME 38, 845 A.2d 575 (imposing a sixty-five-year sentence for a premeditated murder).

[¶ 26] Contrary to Basu's contention, the court did not act beyond its discretion when it determined that the aggravating factors outweighed the mitigating factors and set the maximum sentence at sixty-two years. The court first recognized, as mitigating factors, that Basu had no significant criminal record, held a steady job, and maintained a secure family life. As aggravating factors, however, the court considered the severe consequences suffered by Jamshab's family; that Basu did not accept responsibility, or show remorse for his actions; and that he falsely accused another person of the crime. The court neither erred nor acted beyond its discretion in imposing a maximum sentence of sixty-two years.[8]

---

7. Intentionally murdering a person for monetary gain is one of the most heinous crimes a person may commit. *See* Model Penal Code § 210.6(3)(g) (1962) (listing murder for pecuniary gain as one of the eight aggravating factors to consider when imposing the death penalty); *see also State v. Snow,* 383 A.2d 1385, 1387 (Me.1978).

8. Although Basu argues that the sentence needs to be vacated because the record does not show that the court in fact complied with the good time provisions of 17-A M.R.S.A. 1252-B (Supp. 2002), *repealed by* P.L. 2003, c. 143, § 10 (effective Jan. 1, 2004), the court did in fact state at sentencing that it did consider the provisions of that statute when

## 2. Restitution

[¶ 27] Basu contends that the restitution of $3542.61 was improperly ordered by the court. We disagree. The imposition of restitution is discretionary. *See* 17–A M.R.S.A. § 1323 (Supp. 2004). For a challenge of restitution to be successful, the issue should be raised at sentencing pursuant to 17–A M.R.S.A. § 1325 (1983 & Supp. 2004), in which the defendant must prove incapacity to pay by a preponderance of the evidence. 17–A M.R.S.A. § 1325(4) (Supp. 2004). Because Basu did not challenge the restitution at sentencing, and because he does not meet his burden of proving incapacity as a matter of law, pursuant to 17–A M.R.S.A. § 1325(4), we uphold the order. As the State concedes, however, we must remand the order of restitution so that the court may comply with 17–A M.R.S.A. § 1326–A (Supp. 2004), by ordering the specific time and method of payment. *See State v. Lewis,* 1998 ME 83, ¶ 10, 711 A.2d 119, 124 (holding that the "time and method of payment must be specified in a restitution order").

The entry is:

Judgment of conviction affirmed. Sentence is affirmed, except as to the order of restitution. Order of restitution is vacated, and remanded for further proceedings consistent with this opinion.

reaching its decision. *See State v. Ardolino,* 1997 ME 141, ¶ 27, 697 A.2d 73, 81.