2004 ME 123

**STATE of Maine**

v.

**Gary L. SWEENEY.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Sept. 9, 2004.

Decided: Sept. 28, 2004.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General,

Andrew Benson, Asst. Attorney General, Augusta, for State.

Joel Vincent, Vincent, Kantz & Ruffner, Portland, for Appellant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Gary L. Sweeney appeals the judgment entered in the Superior Court (Cumberland County, *Brennan, J.*), after a jury trial, convicting him of the murder of Christine Pepin, in violation of 17–A M.R.S.A. § 201(1)(A) (Supp.2003). Sweeney contends that (1) the prosecutor committed obvious error by asking Sweeney whether another witness lied, and (2) the evidence was insufficient to convict him of intentionally or knowingly causing Pepin's death. We disagree with his contentions, and we affirm the judgment.

## I. FACTS AND PROCEDURE

[¶ 2] Pepin died on February 4, 2003, as the result of a single gunshot wound to her head. Sweeney was the only witness to Pepin's death. He does not deny that he was holding the gun that killed her. His defense at trial was that Pepin's death was an accident.

[¶ 3] Sweeney and Pepin had lived together for thirteen years and had a son who was twelve years old at the time of Pepin's death. The three lived in a small house without running water or a telephone. The house was on a hill and accessible in the winter by a steep path from the town road. On the day of Pepin's death, Sweeney, Pepin, and their son had been at the home of a neighbor where Sweeney and Pepin had a few drinks and supper. Between 7:30 and 8:00 that evening Sweeney, Pepin, and their son walked up the ice-covered path to their house. The son remained outside throwing snowballs while Sweeney and Pepin went inside. Sweeney went back outside to tell the son to come in and became angry when the son continued to throw snowballs. Sweeney went into the house, got a .22 revolver, and returned outside. The son, who had gone around the side of the house, heard Sweeney "dry-fire" the gun several times. The son heard Sweeney yell to Pepin, asking where the bullets were. The son heard Pepin crying. He was scared and ran to the neighbor's house.

[¶ 4] Sweeney testified that he intended to fire the gun to get the attention of the neighbor because he believed that the son had gone to the neighbor's house. He testified that a gunshot would bring the neighbor outside, and Sweeney could then yell to the neighbor to send the son home. Sweeney admitted that he had never before used a gunshot to get the attention of the neighbor, and there was evidence that the neighbors generally contacted each other through walkie-talkies.

[¶ 5] Sweeney testified that he was unable to find bullets for the gun and so he hollered to Pepin asking her where the bullets were, but she did not respond. He climbed, with the gun, to the sleeping loft where Pepin was lying on the bed and told her the son had left and that he did not want to go back down the hill after him. Sweeney testified that as he was putting the gun away, his finger slipped, the gun went off, and he realized that Pepin had been shot.

[¶ 6] Sweeney went to the neighbor's house and said that he had shot Pepin and they should call 911. He had blood on his clothes and hands. Sweeney was visibly upset, punching a hole in the wall and throwing a flashlight. He apologized to the son for killing his mother and said he was going to jail for a long time. Sweeney

said that he had clicked the gun at Pepin and it had gone off.

[¶ 7] Several officers responded to the neighbor's 911 call. They took Sweeney into custody, and Sweeney made several statements, saying that the gun was not supposed to have any bullets and that he had clicked it four times and then it went off. Other police officers went in the house and determined that Pepin was dead. The police seized a .22 revolver, lying on the bed where Pepin's body had been found. The police determined that the revolver contained five live rounds and one expended round. The medical examiner testified that the gun was either touching Pepin's head or within a few inches of it when the gun was fired.

[¶ 8] Sweeney was indicted for murder and tried before a jury. Much of the evidence was uncontested. One point of dispute between the son's testimony and Sweeney's testimony concerned whether Sweeney "dry-fired" the revolver while the son was standing around the corner of the house or whether Sweeney "clicked" the gun. Sweeney denied that he had been dry-firing the gun and maintained that he had been clicking it.[1] During the cross-examination of Sweeney, the prosecutor asked the following questions:

Q: You are pretty much saying, aren't you, that your son's just lying about some of the things that happened that evening?

A: Some things he is, sir.

Q: [Your son] says, for example, that you were dry firing the gun out-side[. He] is just lying about that?

A: Yes, sir.

[¶ 9] The jury was instructed on murder, that is, intentionally or knowingly causing the death of another,[2] and on manslaughter, that is, causing the death of another either recklessly or with criminal negligence.[3] The jury found Sweeney guilty of murder. The court sentenced Sweeney to forty years imprisonment.

## II. DISCUSSION

### A. Improper Questions by the Prosecutor

[¶ 10] Sweeney contends that the State committed error when the prosecutor twice asked Sweeney if his son was lying. The State concedes that the two questions were improper. *See State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994). Sweeney did not object to the questions, and we review them for obvious error. M.R. Crim. P. 52(b). We do not vacate a conviction for obvious error unless the error has deprived the defendant of a fair trial or created serious injustice. *State v. White*, 2002 ME 122, ¶ 8, 804 A.2d 1146, 1149.

[¶ 11] Questions that ask a witness to give an opinion of another witness's veracity are improper because determining the credibility of a witness is the sole

---

1. Sweeney testified that dry-firing is "when you pull the hammer back and pull the trigger and basically fire an empty weapon." "Click-ing the gun," he testified, "is when you pull the hammer all the way back [and] the cylin-der rotates," and the rotation of the cylinder makes the clicking noise. The son testified that "dry-fire" meant pulling the lever back and pulling the trigger.

2. The pertinent portion of the murder statute reads: "1. A person is guilty of murder if the

person: A. Intentionally or knowingly causes the death of another human being." 17–A M.R.S.A. § 201(1)(A) (Supp.2003).

3. The pertinent manslaughter provision reads: "1. A person is guilty of manslaughter if that person: A. Recklessly, or with criminal negli-gence, causes the death of another human being." 17–A M.R.S.A. § 203(1)(A) (Supp. 2003).

province of the fact-finder. *Tripp*, 634 A.2d at 1320. One witness's opinion of another witness's truthfulness is not helpful to the jury when the jury has the opportunity to hear both witnesses. *Id.* Because the prosecutor has a duty to refrain from conduct that will deprive a defendant of a fair trial, the prosecutor may not employ methods designed to elicit inadmissible evidence when such methods achieve an unjust result. *See State v. Steen*, 623 A.2d 146, 148 (Me.1993).

[¶ 12] Although the prosecutor's questions to Sweeney asking if his son was lying were improper, they do not require us to vacate the judgment. This case differs from *State v. Tripp* where we found obvious error and vacated the conviction. In *Tripp,* the prosecutor asked the witness several times if his son was lying and then told the jury in the closing argument that one of the witnesses was lying. 634 A.2d at 1319 n. 4, 1321. This case also differs from *State v. Steen,* where the prosecutor asked twenty-four questions that forced a witness to give his opinion of whether other witnesses were lying and then compounded that error with remarks in the closing argument. *Steen,* 623 A.2d at 148–49. Here, the prosecutor asked Sweeney twice about whether his son was lying and made no reference to that testimony in the closing argument.

[¶ 13] We said in the *Steen* case: "We do not mean to suggest that isolated questioning of this sort would *per se* require a new trial." *Id.* at 149. We suggested that a curative instruction could alleviate the damage caused by an isolated improper question. *Id.* The two questions in this case were isolated, and the answers were not commented on by the prosecutor in the closing. Had an objection been made, an appropriate curative instruction could have been given.

[¶ 14] Here, although the improper questions solicited inadmissible testimony, that testimony did not create an injustice or deprive Sweeney of a fair trial. With slightly more finesse, the prosecutor could have asked appropriate questions that would have led to answers from Sweeney from which the jury likely would have inferred that Sweeney thought his son was lying or mistaken. Although the prosecutor committed error, it does not rise to the level that requires us to vacate the conviction.

**B. Sufficiency of the Evidence**

　[¶ 15] Sweeney also contends that the evidence was insufficient to support a conviction. We review the sufficiency of the evidence in a criminal case in the light most favorable to the State. We affirm the conviction if a trier of fact, acting rationally, could have found every element of the offense beyond a reasonable doubt. *State v. Chad B.,* 1998 ME 150, ¶ 11, 715 A.2d 144, 147–48.

[¶ 16] It was not contested that Pepin died of a single gunshot wound to her head and that Sweeney had been in possession of the gun and present when Pepin was shot. Contrary to Sweeney's contention, the evidence was sufficient to prove, beyond a reasonable doubt, that Sweeney intentionally or knowingly caused Pepin's death. Sweeney dry-fired a gun while he was yelling to Pepin, asking where the bullets were. The son heard Pepin crying before he ran down the path to the neighbors. Sweeney went up to the loft where Pepin was, taking the gun with him. The gun was next to Pepin's head or only inches from it when the fatal shot was fired. When Sweeney went to the neighbor's house, he told the neighbors that he had shot Pepin. He told his son that he was going to jail for a long time. Sweeney

told the police that he clicked the gun four times and then it went off. These facts and the reasonable inferences that can be drawn from them were sufficient for the jury to find, beyond a reasonable doubt, that Sweeney intentionally or knowingly caused Pepin's death.

The entry is:

Judgment affirmed.