MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2019 ME 105
Docket:       Wal-18-337
Argued:       April 9, 2019
Decided:      July 9, 2019

Panel:        SAUFLEY, C.J., and ALEXANDER, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:     SAUFLEY, C.J., and ALEXANDER, GORMAN, HJELM, and HUMPHREY, JJ.
Dissent:      JABAR, J.

## STATE OF MAINE

v.

## VICTORIA SCOTT

ALEXANDER, J.

[¶1]    Victoria Scott appeals from a judgment of conviction for manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2018), entered in the trial court (Waldo County, *R. Murray, J.*) after a jury trial.   Scott challenges (1) testimony from two witnesses, (2) statements made by the State during its closing argument, (3) the sufficiency of the evidence, (4) the court's denial of her motion for voir dire and a new trial based on allegations of juror misconduct, and (5) her sentence.[1]  We affirm the judgment.

---

[1]  To the extent that Scott raises additional arguments not discussed in this opinion, we are unpersuaded.

## I. CASE HISTORY

[¶2]  Viewing the evidence in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt.  *See State v. Nobles*, 2018 ME 26, ¶ 2, 179 A.3d 910.

[¶3]  On February 8, 2017, Victoria Scott and a friend were at a house in Waldo, where they were staying to help care for the homeowner as she recovered from a serious illness.  Scott had been drinking vodka and smoking marijuana and had recently taken prescription pain killers and anti-anxiety medication.

[¶4]  Sometime around 5:00 p.m., the victim arrived at the house.  The victim was a close friend of the homeowner and stayed at her house regularly enough that he had a key to it; he was well-acquainted with both Scott and the friend.  The victim entered the house through the basement door and came upstairs into the living room where the homeowner was sitting.  He and the homeowner had a discussion about Scott and the friend, during which he made derogatory statements about them and expressed concern that they were taking advantage of the homeowner.  In the course of the conversation, the victim became upset and told the homeowner that he had to leave because he did not want to see Scott and the friend.

[¶5]  Scott and the friend had been in a bedroom listening to the victim's conversation with the homeowner and came out when they heard him leave by the basement stairs.  Appearing upset and angry, Scott asked the homeowner whether she had heard what the victim said about her correctly.  Scott—who was wearing pajama pants and a long-sleeved shirt—then ran back to the bedroom, put on a coat, and quickly went outside to confront the victim.

[¶6]  Once outside, Scott saw the victim walking away from the house and down the long driveway with his back to her.  Scott called after the victim, "what the f--- is your problem?"  The victim turned around abruptly, grabbed Scott by the arms, and shook her while swearing at her.  When he released her, she fell backward on the ground.  The victim turned to continue walking down the driveway.  At that point, Scott acknowledged that she could have safely returned to the house while the victim was walking away, but instead she got up and followed him further down the driveway.  Catching up to the victim, Scott touched his elbow and asked him again, "what the f--- is your problem?" and, "[w]hy would you do that to me?"  Later, she told a detective that she was like a "pit bull . . . with a bone" and that she could not let the victim go without an explanation.

4

[¶7] At some point during this confrontation, Scott pulled out a knife and stabbed the victim. The two had a physical altercation on the snow-covered ground by a log at the edge of the driveway, during which Scott stabbed the victim repeatedly in the back of his left thigh and calf.[2] Scott eventually got up from the ground and ran back into the house.

[¶8] Once inside, Scott—who was covered with blood—told the friend and the homeowner that the victim had attacked her and that she had stabbed him in self-defense. The homeowner called her niece—who lived down the road and was friendly with the victim—and asked her to come to the house to help break up a fight. While Scott cleaned herself up, she asked the friend to retrieve the eyeglasses she lost during her altercation with the victim.

[¶9] The friend went downstairs to go out into the driveway but encountered the victim in the basement. Because the basement was dark, the friend failed to notice the extent of the victim's injuries or how much blood there was on the basement floor. Acting on the information Scott had given him, the friend threw the victim to the floor and told him "you can't attack girls,

---

[2] In total, Scott stabbed the victim five times in the back of the thigh and twice in the calf of his left leg. The victim also had a cut on the right side of his head, a stab wound to his abdomen, a stab wound to his left arm, and a cut on his right forefinger. An autopsy revealed that the stab wounds on the victim's leg severed major arteries in his calf and thigh, which caused extensive bleeding. The State's medical examiner concluded that the victim died as result of blood loss from the stab wounds on his leg.

you know, it's not cool."[3]  The victim did not get up from the floor right away, and the friend thought he was dazed from the fall; feeling bad, the friend helped the victim up and walked him out of the basement to the homeowner's truck, which was parked in the driveway.  The victim sat in the passenger seat of the truck and the friend said to him, "[you] can't be here right now."  The friend then found Scott's glasses further down the driveway and returned to the house.  When he walked by the truck, he saw the victim conscious and seated in the passenger seat.

[¶10]  The homeowner's niece arrived at the house shortly thereafter. Upon her arrival, she noticed blood in the driveway and saw a leg sticking out from an open door of the homeowner's truck.  When she got closer to the truck, she recognized the victim and saw that he was not breathing, his eyes were rolled up in his head, and he was covered in blood.  The niece—who had some medical training—tapped the victim on the shoulder and checked his pulse; finding no signs of life, she called 9-1-1 and pulled the victim from the truck to perform CPR.  She did not stop her resuscitation efforts until police officers and paramedics arrived and took over.  At approximately 6:39 p.m., a paramedic pronounced the victim dead.

---

[3] The friend received immunity from the State in exchange for testifying.

6

[¶11]   Scott came out of the house when the police arrived; she had changed out of her pajama pants and was wearing a pair of ripped jeans.  She told a police officer that she had acted in self-defense and turned over her knife.  Because she was bleeding from a wound on her thigh and appeared to suffer a stress-induced seizure, a second ambulance was called to treat Scott.  When the second ambulance arrived, a paramedic attended to Scott at the scene.  She told the paramedic that the victim had punched her in the face and choked her, but the paramedic saw no visible signs of injury other than the thigh wound.  Scott was subsequently transported to Waldo County General Hospital via ambulance.

[¶12]   When Scott arrived at the hospital, she told the emergency room doctor that she had been strangled and hit her head on the bumper of the truck in the driveway.  The doctor examined her and found no visible signs of trauma other than a laceration on her right thigh.  CT scans of Scott's neck, head, abdomen, and pelvis revealed no bleeding or other abnormalities.  A toxicology screen showed tetrahydrocannabinol (THC), oxycodone, and benzodiazepine in Scott's system.[4]  Scott's blood alcohol level was .126 when it was tested at

---

[4] Scott had another seizure-like event shortly after arriving at the hospital and was treated with benzodiazepine.  The emergency room doctor testified that this could explain the benzodiazepine that appeared in Scott's toxicology screen.

approximately 8:30 p.m.[5]  The emergency room doctor sutured the laceration on Scott's thigh and discharged her from the hospital at approximately 12:30 a.m. on February 9, 2017.

[¶13]  After leaving the hospital, Scott returned to the house in Waldo with a detective to participate in a video-recorded walkthrough.  She then spoke with the same detective in several follow-up interviews over the next few days.  Although Scott maintained that she had acted in self-defense, she made several inconsistent statements and did not have any bruising or visible signs of injury other than the cut on her leg.

[¶14]  In May 2017, Scott was indicted by a Waldo County grand jury and charged with one count of manslaughter (Class A), 17-A M.R.S. §§ 203(1)(A), 1252(4) (2018).  After a five-day jury trial in April 2018, the jury returned a guilty verdict.  Shortly thereafter, Scott filed a motion for a new trial, alleging that a juror had engaged in misconduct that compromised the integrity of the trial and asking the court to question the juror and order a new trial.  *See* M.R.U. Crim. P. 33.  The State opposed the motion and, following a hearing on the matter, the court denied it.

---

[5] As part of the autopsy procedure, the victim's blood was also tested.  It showed a blood-alcohol level of .098, and was also positive for caffeine, codeine, and tetrahydrocannabinol (THC).

8

[¶15]   Scott also filed a motion for a presentence psychological evaluation, which was granted.   After Scott was evaluated, a presentence psychological evaluation report and a later addendum were filed with the court. The sentencing hearing was ultimately held in August 2018, at which time the court entered a judgment of conviction and sentenced Scott to sixteen years of imprisonment, with all but eleven years suspended, and four years of probation.  It also ordered Scott to pay $5,531.60 in restitution to the Victims' Compensation Fund.

[¶16]   Scott timely appealed from the judgment of conviction.  *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).[6]

## II.  LEGAL ANALYSIS

A.    Challenged Testimony

[¶17]  Scott first asserts that testimony from two of the State's witnesses unfairly prejudiced the jury and deprived her of a fair trial.  We address the challenged testimony of each witness in turn.

---

[6]  Scott also filed an application to be permitted to appeal her sentence, which was denied by the Sentence Review Panel in October 2018.  *See* M.R. App. P. 20.  Additionally, Scott has filed a petition for post-conviction review, which has been automatically stayed pending the outcome of this appeal. *See* 15 M.R.S. § 2126 (2018).

1.    The Homeowner

[¶18]  Scott filed a pretrial motion in limine seeking to bar the State from introducing evidence regarding two other alleged stabbings.  The court granted the motion.  During Scott's cross-examination of the homeowner at trial, the homeowner obliquely referenced one of the incidents in a nonresponsive statement:

> [Defense Counsel:] Okay. . . .  Let's switch gears a little bit here.  You gave several statements to the police, do you remember that?  Two that night and one probably a little later in the morning; do you recall?
>
> [The homeowner:] No, I recall somebody come up to my brother's a couple of times, and I had to give my shoes up, and *I told them that my son was stabbed by her*.

(Emphasis added.)  Scott did not object to the testimony, expressly declined a curative instruction in a strategic attempt to avoid highlighting the statement, and did not move for a mistrial.  She now contends on appeal that the homeowner's testimony "irretrievably tainted the jury's view of [her] and every piece of evidence, and thus requires . . . a new trial."

[¶19]   Although Scott argues that the admission of the homeowner's statement was an obvious error that affected her substantial rights, we have previously cautioned that "[w]e do not review alleged errors that resulted from a party's trial strategy," *State v. Rega*, 2005 ME 5, ¶ 17, 863 A.2d 917, because

"[o]bvious error review provides no invitation to change trial and instruction request strategy when the results of the original strategy turn out less favorably than hoped for," *State v. Cleaves*, 2005 ME 67, ¶ 13, 874 A.2d 872.

[¶20]  By expressly declining a curative instruction for strategic reasons and not otherwise moving for a mistrial, Scott failed to preserve for appellate review the admissibility of the homeowner's statement or any potential prejudice flowing therefrom.  *See Rega*, 2005 ME 5, ¶ 17, 863 A.2d 917; *Maine Appellate Practice* § 403(a) at 314 (5th ed. 2018) ("[T]he Court will not undertake an obvious error review when a litigant affirmatively approves or consents to a court action.").

2.    The Detective

[¶21]    During Scott's cross-examination of the Maine State Police detective who had interviewed her after the incident, Scott asked the detective, "But you can't talk to [the victim] anyway, right?"  The detective responded, "No, she killed him."   Although the detective's answer was responsive to the question, Scott immediately requested a sidebar at which she objected, saying, "I object, Your Honor.  That's what this trial is here for to decide if she's responsible for his death or not.  And it is wholly objectionable that he has made that pronouncement.  I'd like that stricken from the record."  The court agreed

to strike, and instructed the jury, "Men and women of the jury, the last portion of the last response by the witness to the effect where the witness said she killed him was not responsive to the question and I'd ask you to disregard that portion of the response."  Scott did not move for a mistrial.

[¶22]  Scott contends on appeal that the court's curative instruction was inadequate because the statement could not "be erased from the jurors' minds." We note first—and Scott conceded the same at oral argument—that there was no dispute at trial that Scott stabbed the victim repeatedly and that he died from the resulting wounds.  Thus, we are not persuaded that the detective's statement that Scott killed the victim was unfairly prejudicial.

[¶23]  Even accepting Scott's argument that she was unfairly prejudiced, we have consistently held that a "trial court's determination of whether exposure to potentially prejudicial extraneous evidence would incurably taint the jury verdict or whether a curative instruction would adequately protect against consideration of the matter stands unless clearly erroneous."  *State v. Nelson*, 2010 ME 40, ¶ 6, 994 A.2d 808; *see also State v. Ardolino*, 1997 ME 141, ¶ 18, 697 A.2d 73 ("We . . . must presume that the jury heeds the [trial] court's instruction[s].").  Pursuant to that standard of review, we discern no error in the court's decision to issue a curative instruction—*as Scott requested*—

12

directing the jury to disregard the statement.[7] *See State v. Conner*, 434 A.2d 509, 511 (Me. 1981) (holding that a defendant acquiesces in the curative approach used by the trial court when she neither asks for a mistrial nor argues "that it would expect too much of human nature to believe the jurors could forget or disregard" the stricken statement).

B.    Allegations of Prosecutorial Misconduct

[¶24]   Scott next asserts that the prosecutor made several statements during his closing argument that constituted prosecutorial misconduct and compromised the integrity of the trial.  She contends,

> He argued two theories that had not been supported by evidence during trial, and misrepresented two pieces of testimony to support these arguments.  The first unsupported argument was that [Scott] had stabbed [the victim] while they were both standing.  The second unsupported argument was that [Scott] did not have her jeans on while she was outside, only her pajama pants.  The prosecutor also misrepresented two pieces of testimony to support his unsupported theories.

Scott did not object to the prosecutor's closing arguments at trial.

---

[7] Scott also challenges a statement made by the same detective during cross-examination in which he expressed his opinion that Scott "was a very competent and composed liar."  Scott did not object to the statement at trial but now contends that the admission of the statement constituted obvious error.  Even if we accept that the statement was objectionable, we discern no obvious error in the fact that the court did not address the detective's statement *sua sponte*.  *See State v. Perkins*, 2019 ME 6, ¶ 2 n.1, 199 A.3d 1174.

[¶25]  Because Scott did not object to the statements at trial, we review for obvious error.  *See State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.  "To prevail on an argument that prosecutorial misconduct amounted to obvious error, a defendant must first demonstrate that (1) there was prosecutorial misconduct that went unaddressed by the court and (2) the error was plain." *Nobles*, 2018 ME 26, ¶ 21, 179 A.3d 910.  If the defendant meets this burden, she "must next demonstrate (3) that the error was sufficiently prejudicial to have affected the outcome of the proceeding."  *Id*.  "Even if these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings."  *Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032.  "When a prosecutor's statement is not sufficient to draw an objection, particularly when viewed in the overall context of the trial, that statement will rarely be found to have created a reasonable probability that it affected the outcome of the proceeding." *Id.* ¶ 38.

[¶26]  A prosecutor "may present an analysis of the evidence in summation with vigor and zeal" but is prohibited from "[m]isrepresenting material facts in the record or making statements of material fact unsupported by any evidence."  *Id*. ¶¶ 41, 42.  "[W]e have repeatedly . . . upheld the

prosecutor's ability to argue vigorously for any position, conclusion, or inference supported by the evidence." *State v. Cote*, 2017 ME 73, ¶ 26, 159 A.3d 831 (second alteration in original).

### 1. The Timing of the First Stabbing

[¶27] Scott argues that the prosecutor, in his closing, "pushed the fiction that [she] ran out of the house with the knife in her hand and stabbed [the victim] as he walked away from her." Scott contends that there was no evidence to support the prosecutor's closing argument that she "was the one [who] provoked any reaction on the part of [the victim] by confronting him down by the truck and then stabbing him in the back of the thigh as he's walking away past the blue bus" that was parked further down the driveway.

[¶28] Contrary to Scott's contention, the prosecutor's argument on this issue was fairly based on the facts in evidence. The medical examiner testified that of the five stab wounds on the victim's thigh, one was further away from the other clustered wounds and was oriented differently. The medical examiner explained that this suggested the wound was inflicted at a different time with the knife held at a different angle. Furthermore, in an interview—a recording of which was admitted in evidence—Scott responded to a police detective's questions about when she took out her knife as follows: "it was more

towards when we were past the blue bus when it came out." Although, at trial, Scott denied taking the knife out before she was on the ground fighting with the victim, the prosecutor was free to argue to the jury that, based on the evidence presented, it could arrive at a different conclusion. Because the prosecutor's suggested inference was fairly based on the evidence, his comments did not constitute prosecutorial misconduct. *See Cote*, 2017 ME 73, ¶ 27, 159 A.3d 831.

2.      Jeans or Pajama Pants

[¶29]  Scott contends that the prosecutor made an unsupported assertion during closing argument that she was wearing only pajama pants when she went outside to confront the victim. The question of which pants she was wearing was important to show her state of mind because she testified that she always kept her knife in the pocket of her jeans, and did not ordinarily keep the knife in the pocket of her pajama pants.

[¶30]  Once again, the prosecutor's assertion regarding Scott's pants was fairly based on the facts in evidence. The friend who was present at the house on the night of the incident testified that Scott was wearing pajama pants—not jeans—when she came back inside the home after the altercation, and that she changed into jeans only after returning to the house. Although Scott testified that she was wearing the jeans over the pajama pants when she went outside,

16

and the EMT who treated her at the scene testified that she was wearing jeans with a rip near her thigh wound, the prosecutor was free to suggest a different conclusion to the jury based on the friend's testimony.[8]   The prosecutor's assertion regarding pajama pants was not prosecutorial misconduct.

      3.     She "Grabbed Something" and "You Don't Grab Someone by the Shoulders"

[¶31] Scott challenges the following statement made by the prosecutor during closing argument: "[The homeowner] said [Scott] went into the bedroom and grabbed something.  Did she go in and grab that knife after [the victim] is trash talking her to [the homeowner]?"  Scott correctly points out in her brief that the homeowner did not, in her trial testimony, say anything about Scott grabbing something; the homeowner's actual testimony was "[Scott] goes running to my son's room and comes running back out, went out the back door off the kitchen."   The State acknowledges that its attorney "apparently misspoke" on this point, but argues that "it was reasonable for the prosecutor

---

    [8] We will not intrude "on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *State v. Hansley*, 2019 ME 35, ¶ 22, 203 A.3d 827.  Both pairs of pants were admitted in evidence, and during deliberations the jury requested permission to take the jeans out of a sealed plastic bag to examine them.  The court gave the jurors permission to remove the jeans and any other sealed exhibits they wished to look at so long as they used rubber gloves.

to ask the jury to infer that Scott went into her bedroom to retrieve the knife before she went outside to confront [the victim]."

[¶32]  Scott takes further issue with the portion of the State's rebuttal closing argument in which the prosecutor said, "When that person calls you names and shoves you down, you don't grab their shoulder, pull out your knife, and stab them in the leg."  She argues that "[t]here was never any testimony or evidence that [Scott] grabbed [the victim] by his shoulders."  We note that although there is no evidence that directly supports the State's argument on this point, Scott did testify that, after her first altercation with the victim, she followed him down the driveway and "reached out and touched his elbow."

[¶33]  When viewed in the overall context of the five-day trial, the prosecutor's minor misstatements about the testimony and shoulder grabbing do not rise to the level of prosecutorial misconduct.  *See Dolloff*, 2012 ME 130, ¶ 44, 58 A.3d 1032 ("The mere existence of a misstatement by a prosecutor at trial, or the occasional verbal misstep, will not necessarily constitute misconduct when viewed in the context of the proceedings.").[9]

---

[9]  Scott also contends that the prosecutor engaged in misconduct by stating in his closing argument that she lied to the police.  Although a prosecutor "may not properly convey to the jury his [or her] personal opinion that a defendant is lying," *State v. Smith*, 456 A.2d 16, 17 (Me. 1983), a prosecutor "may suggest that a defendant lied as long as the evidence justifies that opinion and the prosecutor couches the commentary in terms linking the accusation to the evidence," *State v. Thongsavanh*, 2004 ME 126, ¶ 5 n.7, 861 A.2d 39.  Because the prosecutor couched his statement that Scott lied to the police in terms of the testimony of a police detective who had highlighted several inconsistencies

18

[¶34]  There is no indication that the prosecutor acted in bad faith, and any possible prejudice to Scott that resulted from the misstatements was remedied by the court's instructions to the jury that "the opening statements and closing arguments of each of the attorneys are not evidence" and "[i]f once you get inside the jury room your memory of the evidence is different from their memory of the evidence, it's your memory that counts, not theirs."  *See State v. Winslow*, 2007 ME 124, ¶ 24, 930 A.2d 1080 ("[U]nless there is prosecutorial bad faith or exceptionally prejudicial circumstances, curative instructions are sufficient.").  Recognizing that "trials are inherently imperfect and unintended errors inevitably occur," *State v. Pabon*, 2011 ME 100, ¶ 28, 28 A.3d 1147, we conclude that the aggregate impact of these misstatements did not affect the jury's verdict or otherwise compromise Scott's right to a fair trial.[10]

---

in Scott's statements to the police, the prosecutor was not expressing his personal opinion as to Scott's credibility, and therefore his statement did not constitute misconduct.

  [10]  In its cumulative-error analysis, the dissent references four asserted errors that are discussed in this opinion: two instances of purportedly "inadmissible and prejudicial testimony," one instance of a purportedly improper comment on the truthfulness of the defendant, and one instance of purportedly arguing facts not supported by the evidence.  To support its analysis, the court then references the recent Sixth Circuit opinion in *United States v. Acosta*, 924 F.3d 288 (6th Cir. 2019).

  *Acosta* was a joint trial of two defendants on a drug charge.  *Id*. at 293.  The improper acts found by the Sixth Circuit included (1) three vouching or bolstering remarks regarding government witnesses, for example "[the witness] testified very well, he understood and remembered everything he did"; (2) three attacks on defense witnesses' credibility, for example "[the witness] is a proven liar, don't believe anything he had to say"; and (3) three attacks on one defendant's religious views—one in questioning during cross-examination and two during argument, the second of which was also an attack on the defendant's credibility—for example, "[the defendant is] the worshiper of a deity of a

C.      Sufficiency of the Evidence

[¶35]   Scott argues that the "evidence was insufficient to prove every element of manslaughter or to disprove every element of self-defense beyond a reasonable doubt."

[¶36]  "A person is guilty of manslaughter if that person . . . [r]ecklessly, or with criminal negligence, causes the death of another human being." 17-A M.R.S. § 203(1)(A).  "A person acts recklessly with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result."  17-A M.R.S. § 35(3)(A) (2018).  "A person acts with criminal negligence with respect to a result of the person's conduct when the person fails to be aware of a risk that the person's conduct will cause such a result."  17-A M.R.S. § 35(4)(A) (2018).  For these states of mind, the actor's conscious disregard of the risk or the failure to be aware of the risk "must involve a gross deviation from the standard of conduct that a

drug trafficking entity who prays for protection from police, prosecutors, court systems and juries. Is he entitled to any credibility for what he said?  No, not at all."  *Id*. at 298-306 (emphasis omitted).

The extent of the errors referenced in *Acosta* stands in marked contrast to the few purported errors on close questions asserted by the dissent here.  Indeed, the court in *Acosta* discussed nine separate errors and referenced two more—the questioning of a witness about the penalty for a charged crime and refusing the jury's request to view an admitted exhibit—to support vacating the jury's verdict.  *Id*. at 296, 298.  If anything, *Acosta* shows the extent of serious errors that must be committed for an appellate court to apply the cumulative-error doctrine to vacate a jury's verdict. It demonstrates that the many fewer purported errors asserted by the dissent do not constitute cumulative error sufficient to justify vacating the jury's verdict.

reasonable and prudent person would observe in the same situation." 17-A M.R.S. § 35(3)(C), (4)(C) (2018).

[¶37] "The culpable state of mind required by the statutory definition of manslaughter therefore calls for jurors to resort to their own experiences and common sense in order to identify normative expectations about how 'reasonable and prudent' people should act in a particular situation." *State v. Lowe,* 2015 ME 124, ¶ 33, 124 A.3d 156. "We will leave such a determination undisturbed as long as it is rational." *Id.* Viewing the evidence in this case in the light most favorable to the State, the jury could have rationally found beyond a reasonable doubt that when Scott stabbed the victim, she consciously disregarded or failed to be aware of the risk that her conduct would cause the victim's death, and that her conscious disregard or failure to be aware of the risk involved a gross deviation from the standard of conduct a reasonable and prudent person would have observed in the same situation. *See* 17-A M.R.S. § 35(3)-(4) (2018); *State v. Michaud*, 1998 ME 251, ¶¶ 12-13, 724 A.2d 1222. The evidence presented at trial rationally supports the jury's finding beyond a reasonable doubt that Scott caused the victim's death.

[¶38] As requested by Scott, the court instructed the jury on self-defense. Scott asserts that the evidence was not sufficient to support the jury's rejection

of the justification of self-defense.  As the defendant, she "[bore] the burden of production to generate the issue with sufficient evidence, though the State [bore] the burden of persuasion to disprove the defense."  *State v. Herzog*, 2012 ME 73, ¶ 8, 44 A.3d 307.  A person is justified in using deadly force against another "when [she] reasonably believes it necessary and reasonably believes such other person is . . . [a]bout to use unlawful, deadly force against [her]." 17-A M.R.S. § 108(2)(A)(1) (2018).  A person is not, however, justified in using deadly force if she "provokes such other person to use unlawful deadly force" while intending to cause physical harm, or she knows she can "[r]etreat from the encounter" in "complete safety."  17-A M.R.S. § 108(2)(C)(1), (2)(C)(3)(a) (2018).  Once a self-defense issue is generated, "the fact-finder must then determine whether the State has satisfied its burden of persuasion by disproving at least one element of self-defense and establishing each element of the crime beyond a reasonable doubt." *Herzog*, 2012 ME 73, ¶ 9, 44 A.3d 307.

[¶39]  Contrary to Scott's assertions, there is significant evidence that undermines her claims of self-defense.  Foremost among that evidence is her own testimony that she could have safely returned to the house after her first altercation with the victim.  Based on that testimony alone, the jury could have

rationally found beyond a reasonable doubt that Scott was not justified in using deadly force. *See* 17-A M.R.S. § 108(2)(C)(3)(a).

D.      Denial of Motion for Voir Dire and a New Trial

[¶40]  Scott argues that the court erred by denying her motion for voir dire of a juror (identified as Juror A) who communicated about the case three separate times during a break from deliberations, as well as her request for a new trial, *see* M.R.U. Crim. P. 33, because of that misconduct.

[¶41]  The court held a hearing on Scott's motion and heard arguments from both sides. Scott does not suggest that any relevant facts could have been developed that were not addressed by the parties' arguments at hearing. At the conclusion of the hearing, the court made the following findings:

> [T]he behavior of the juror that has been identified relates to a violation of what this [c]ourt had indicated to the jurors in not speaking with others about the case and indicating to the jurors on numerous occasions if anyone attempted to communicate with them to notify the court. So in that context the misconduct of the Juror A that's been referenced here has been identified as being three occasions in which the juror initiated some kind of communication or contact with three different individuals. The State's attorneys in passing on the way to lunch, which has been identified at the time and since in these memorandums; the contact the juror initiated with what was later identified as [Scott's] sister in a bathroom during or contemporaneous with that lunch break; and the juror's initiation of the communication with the court officer upon returning from that same lunch break. All of those instances involve the juror again initiating communication and making comments to the effect relevant to her alluding to hoping

> to make the right decision, praying to make the right decision, et cetera, or an acknowledgement of the difficulty that the circumstances may have with various family members.

The court also found that, because there was no evidence "whatsoever of . . . any extraneous information being presented to the juror from any outside source," no presumption of prejudice arose, and no further information could be obtained through voir dire. Based on those findings, the court denied Scott's motion.

[¶42] "We review the trial court's decision on a motion for a new trial for an abuse of discretion and any findings underlying its decision for clear error." *State v. Daluz*, 2016 ME 102, ¶ 44, 143 A.3d 800. We give necessary deference to the trial court's decisions on such issues because "trial courts possess a greater ability to perceive the fairness of trial proceedings than can a reviewing court on appeal." *Id.* ¶ 45.

[¶43] The Maine and federal constitutions guarantee that criminal defendants shall have the right to an impartial jury trial. U.S. Const. amend. VI; Me. Const. art. I, § 6. "To be valid, verdicts in criminal cases must be the result of honest deliberations, absolutely free from juror prejudice or bias." *State v. Royal*, 590 A.2d 523, 524 (Me. 1990). "[O]bjective irregularities, such as information acquired by a juror during trial through unauthorized

communications, can be shown by the defendant as an indication that a verdict is invalid." *Id*. at 524-25.

[¶44] Courts, however, are "generally barred from inquiring into the jury's deliberations" because of the long-established rule that "a juror is not available to impeach a verdict in which [that juror] participated." *State v. Leon*, 2018 ME 70, ¶ 8, 186 A.3d 129 (alteration in original). "The law strongly disfavors inquiry into the deliberations of juries," *State v. Watts*, 2006 ME 109, ¶ 15, 907 A.2d 147, and courts will do so only within "narrowly drawn exceptions" to the general prohibition, when, "for example, a report [is made] that a juror has been improperly exposed to extraneous prejudicial information or an outside influence, or that a juror has engaged in external misconduct affecting the verdict," *Leon*, 2018 ME 70, ¶ 10, 186 A.3d 129; *see also* M.R. Evid. 606(b); *State v. Hurd*, 2010 ME 118, ¶ 42, 8 A.3d 651 (stating that courts cannot "inquire[] into the jury's deliberative process beyond establishing, to the extent permitted by M.R. Evid. 606(b), that the jury's original verdict . . . was not the product of outside influence or external juror misconduct").

[¶45] Scott acknowledges that the communications did "not creat[e] identifiable prejudice," but contends that they are presumptively prejudicial

pursuant to *Remmer v. United States*, 347 U.S. 227, 229 (1954). In *Remmer*, the United States Supreme Court said,

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id*. Under this framework, Scott argues that the court should have conducted voir dire to investigate if Juror A "spoke to anyone else" and whether the "incidents were harmful or harmless."

[¶46] We have noted before that "[t]he continuing validity of the presumption of prejudice standard articulated in *Remmer*, placing a special burden of persuasion on the prosecution, has been subject to question for some time." *State v. Cheney*, 2012 ME 119, ¶ 27, 55 A.3d 473; *see also Smith v. Phillips*, 455 U.S. 209, 215-16 (1982) (placing the burden on a defendant alleging juror bias to prove the existence of bias).

[¶47] Although we have not directly addressed the issue, we have previously "indicated that to raise a presumption of prejudice to impose a burden of proof on the State, the extraneous information [communicated to the

26

juror] must relate to the law or facts of the case." *Cheney*, 2012 ME 119, ¶ 31, 55 A.3d 473; *see also State v. Coburn*, 1999 ME 28, ¶¶ 5, 16, 724 A.2d 1239 (concluding that the knowledge of a juror who drove to an intersection at issue and shared her thoughts with other jurors was sufficiently related to the case); *State v. Allard*, 557 A.2d 960, 961-62 (Me. 1989) (holding that a communication from a police officer to a juror, who was a relative, that the police officer had informed the prosecutor of their relationship after the officer testified in the case did not relate to the substance of the case).

[¶48]  In accordance with *Cheney*, we conclude that no presumption of prejudice arose in the circumstances presented by this case.  Although the juror did unfortunately engage in misconduct, the court supportably found that she did not express any bias toward Scott and what little information she received through her improper communications was not relevant to either the facts the juror was asked to determine or the law she was instructed to apply in making her decision.

[¶49]  Accordingly, the court did not abuse its discretion when it denied Scott's motion seeking voir dire of Juror A.  *Cf. State v. Fuller*, 660 A.2d 915, 918 (Me. 1994) (holding that a defendant was not entitled to an evidentiary hearing on his motion for a new trial because his allegations of juror misconduct, even

if proved, were insufficient to show any extraneous information was conveyed to the jury). Given that Juror A's misconduct had already come to light and was not shown to have affected the jury's verdict, the court's decision struck a reasonable balance between Scott's rights and the disfavor of post-verdict inquiry into jury deliberations. For these same reasons, we discern no abuse of discretion in the court's denial of Scott's motion for a new trial.

E.    Sentencing

[¶50]  Finally, Scott contends that the sentence imposed on her by the trial court is unconstitutional because it is disproportionate and "cruel and unusual." U.S. Const. amend. VIII; *see* Me. Const. art. I, § 9. She argues that the trial court impermissibly punished her for having an autism spectrum disorder that, according to a presentence psychological evaluation report, might limit her ability to show remorse. "We review the legality and constitutionality of a sentence de novo."[11] *State v. Bennett*, 2015 ME 46, ¶ 14, 114 A.3d 994.

[¶51]  We are not persuaded by Scott's argument that her sentence of sixteen years of imprisonment with all but eleven years suspended—which falls well within the limits authorized by the Legislature—is unconstitutional.

---

[11]  As discussed earlier, Scott's application to appeal her sentence was denied by the Sentence Review Panel in October 2018. *See* M.R. App. P. 20.

*See* 17-A M.R.S. § 1252(2)(A) (2018) (authorizing courts to impose a term of imprisonment of up to thirty years); *cf. State v. Ward*, 2011 ME 74, ¶ 18, 21 A.3d 1033 (stating that "only the most extreme punishments decided upon by [the Legislature] as appropriate for an offense could so offend or shock the collective conscience of the people of Maine as to be unconstitutionally disproportionate, or cruel and unusual" (alteration in original)). Although in sentencing Scott the court did find her lack of acceptance of responsibility and remorse an aggravating factor, it did so while referring to the findings of the presentence psychological evaluation report; this indicates that the court gave adequate consideration to the findings of that evaluation. Accordingly, we discern no illegality that appears plainly in the record. *See Bennett*, 2015 ME 46, ¶ 11, 114 A.3d 994.

The entry is:

> Judgment affirmed.

---

JABAR, J., dissenting.

[¶52] I respectfully dissent because I believe that Scott was denied a fair trial due to the cumulative effect of inadmissible and prejudicial testimony of two witnesses and improper remarks made by the prosecutor during closing

argument. Although each of these errors may be harmless when viewed in isolation, the errors, when considered in toto, require reversal of the conviction. *See State v. Boyd*, 401 A.2d 157, 161 (Me. 1979).

A.    Inadmissible and Prejudicial Testimony

[¶53]  There were two occasions during the trial when inadmissible and prejudicial testimony was presented to the jury.

1.    Testimony Regarding Alleged Past Stabbing

[¶54]  Scott filed a pretrial motion in limine seeking to exclude testimony regarding two other incidents where Scott allegedly used a knife and stabbed an individual. The court granted the motion. At trial, however, a witness testified on cross-examination that Scott had stabbed her son. Scott did not object to this testimony or request a curative instruction. Further, at the conclusion of the cross-examination, the witness's testimony was discussed during a bench conference, but Scott's attorney did not request a curative instruction or a mistrial. *See State v. Sexton*, 2017 ME 65, ¶¶ 36-39, 159 A.3d 335 (considering a M.R. Evid. 404 issue under the obvious error standard of review, along with a defendant's similar decision to decline a curative instruction).

[¶55] On appeal, Scott contends that this testimony denied her a fair trial. Because Scott neither objected to this testimony at trial nor moved for a mistrial, we review for obvious error. *State v. Patton*, 2012 ME 101, ¶ 28, 50 A.3d 544; *State v. Young*, 2000 ME 144, ¶¶ 1, 7, 755 A.2d 547.

[¶56] M.R. Evid. 404 precludes "[e]vidence of a person's character or character trait . . . to prove that on a particular occasion the person acted in accordance with the character or trait." M.R. Evid. 404(a)(1). Here, the trial court properly granted Scott's unopposed motion in limine, barring any reference to past incidents involving Scott stabbing another individual. *See State v. Mills*, 2006 ME 134, ¶ 16, 910 A.2d 1053.

[¶57] The admission of this testimony constitutes plain error in violation of the court's order excluding such evidence and standing alone could have warranted, in the court's discretion, the grant of a mistrial. *See State v. Lambert*, 528 A.2d 890, 894 (Me. 1987) (Scolnik, J., dissenting) (considering a M.R. Evid. 404 issue and reasoning that "[i]n a one-on-one credibility competition for the jury's acceptance of testimony, I cannot imagine a clearer instance of a seriously prejudicial error tending to produce manifest injustice" (quotation marks omitted)). Nevertheless, this plain error, arguably not prejudicial

enough to warrant vacating the conviction, is certainly an important factor in the cumulative-error analysis discussed later. *See* infra ¶¶ 73-77.

 2. Detective's Testimony Asserting that Scott is a "Very Competent and Composed Liar"

[¶58] During the fourth day of the trial, a Maine State Police detective was questioned about whether Scott had taken the knife out of her pocket before or after she was on the ground. The detective testified:

> Yes. And I guess . . . what I'm saying to you is if you listen to the audio of when I interview her after the walk-through and I say to [Scott], you told me you were outside first and she says adamantly time after time I never said that, I never said that, when I clearly had a record that she did, *I knew that* [*Scott*] *was a very competent and composed liar*, that she was lying to me in that moment, and I believed that's what was going on here.

Scott's attorney did not object to this testimony.

[¶59] Generally, "[o]ne witness's opinion of another witness's truthfulness is not helpful to the jury when the jury has the opportunity to hear both witnesses." *State v. Sweeney*, 2004 ME 123, ¶ 11, 861 A.2d 43; *State v. Steen*, 623 A.2d 146, 149 (Me. 1993) ("Determining what credence to give to the various witnesses is a matter within the *exclusive province* of the jury." (quotation marks omitted)). In this case, the prejudicial effect of the detective's testimony is not limited to infringing on the province of the jury's credibility determination; it is far more prejudicial because this accusation was provided

by the detective charged with investigating the stabbing and reinforced later by the prosecutor during his closing argument. *See Cordova v. State*, 6 P.3d 481, 485 (Nev. 2000) ("[T]he detective's opinion on the truthfulness of [defendant's] confession did implicate the ultimate question of guilt or innocence, and we recognize the possibility that jurors may be improperly swayed by the opinion of a witness who is presented as an experienced criminal investigator." (quotation marks omitted)). Here, where there were no eyewitnesses to the incident and Scott was claiming self-defense, the case rested entirely on the credibility of Scott, and a serious prejudicial effect was created when the investigating detective testified that Scott—who would also testify as a witness—was a "very competent and composed liar." *See Flynn v. State*, 847 P.2d 1073, 1076 (Alaska Ct. App. 1993) ("By allowing this testimony to be admitted, the trial court effectively enabled [the police sergeant] to perform the role of a 'human polygraph.' This court has consistently noted the inappropriateness of such evidence.").

[¶60] Because there was no objection to this testimony, we must review this error using the obvious error standard of review. *Patton*, 2012 ME 101, ¶ 28, 50 A.3d 544. The detective's statement that Scott is a "very competent and composed liar" constitutes plain error. *See Sweeney*, 2004 ME 123, ¶ 11,

861 A.2d 43; *cf. State v. Gaudreau*, 139 A.3d 433, 447-49 (R.I. 2016). Although, it may be argued that the error, when viewed in isolation, fails to rise to the level of denying Scott a fair trial, this plain error is another significant factor affecting a cumulative-error analysis. *See* infra ¶¶ 73-77.

B.      Prosecutorial Misconduct

[¶61]    During closing arguments, the prosecutor (1) improperly commented on the truthfulness of the defendant and (2) argued facts that were not supported by the evidence. Similar to a recently decided case from the United States Court of Appeals for the Sixth Circuit, "[n]ot one of the prosecutor's statements drew an objection from trial counsel. Therefore, we may remand for a new trial only if plain error occurred." *United States v. Acosta*, 924 F.3d 288, 298-99 (6th Cir. 2019) (vacating a conviction "because of numerous errors relating to the prosecutor's misconduct at trial that, considered cumulatively, deprived [the defendants] of a fair proceeding.").

1.      Prosecutor's Improper Comment on the Veracity of Scott

[¶62]  During closing argument, the prosecutor stated: "But you know who else . . . lied to the police? Victoria Scott. How many different versions did she give to [the detective] about what happened in that driveway."

[¶63] We have consistently held that a lawyer must not assert a personal opinion regarding the credibility of a witness unless it is an argument grounded in an analysis of the evidence. *See State v. Weisbrode*, 653 A.2d 411, 415-16 (Me. 1995). Moreover, "this applies with particular force to the statements of prosecutors, and . . . [a] prosecutor's statements of personal opinion are particularly troubling when the comments concern a defendant's credibility and the case is a close one." *Id.* at 416; *State v. Michaud*, 2017 ME 170, ¶ 13, 168 A.3d 802 (concluding that the prosecutor's comment that "'science doesn't lie' was isolated, was not initially objected to, and did not involve vouching for a particular witness," and stating, "*Most important, the prosecutor never argued that* [*defendant*] *was lying*" (emphasis added)); *see also Acosta*, 924 F.3d at 300 (noting that "comments on credibility not coupled with a more detailed analysis of the evidence convey an impression to the jury that they should simply trust the State's judgment that a witness is or is not credible" (alteration omitted) (quotation marks omitted)).

[¶64] In *State v. Tripp*, 634 A.2d 1318, 1319-21 (Me. 1994), we employed an obvious error analysis—there was no objection to the improper statements made by the prosecutor—and we vacated a conviction of three counts of gross sexual assault based, in part, on a prosecutor's statement during closing

argument that created a "clear implication . . . that the prosecutor believed that the victim told the truth but defendant lied."[12] We reasoned that "[d]etermining what credence to give to the various witnesses is a matter within the *exclusive province* of the jury" and because the case was a close one that "turned on the credibility of defendant and the victim" the prosecutor's remark, opining on the defendant and victim's credibility, "constitute[d] serious obvious error and require[d] reversal." *Id.* at 1320-21 (quotation marks omitted).

[¶65] Here, the prosecutor's statement did not "merely advis[e] the jury that it could conclude that [Scott was not] telling the truth." *See Weisbrode,* 653 A.2d at 416. Nor did the prosecutor's statement merely create an implication that the prosecutor believed that the defendant was lying. *See Tripp,* 634 A.2d at 1321. Instead, the prosecutor conclusively stated that Scott lied to a detective—the same detective who had already testified before the same jury that Scott was a "very competent and composed liar." *Cf. Gaudreau*, 139 A.3d at 449 ("The fact that the jury viewed a videotape of the very detective sitting on the witness stand telling defendant that he was a liar *compounded the*

---

[12] The relevant portion of the prosecutor's statement in *State v. Tripp* was as follows: "that nine-year old boy *told you the truth*. He told you what happened to him. He told you what his father did to him. . . . [I]t does all come down to [the victim] and [the defendant], because one of them wasn't telling the truth. *One of them was lying here to all of us.*" 634 A.2d 1318, 1321 (Me. 1994) (alterations and quotation marks omitted).

*danger that the jury might have been prejudiced against defendant.*" (emphasis added)); *see also State v. Smith*, 456 A.2d 16, 18 (Me. 1983) ("The impropriety of an assertion by the prosecutor conveying his personal view that the defendant has lied or is guilty, is considered serious enough to require an instruction addressed specifically to the improper assertion."). Standing alone, I believe this constitutes obvious error warranting a reversal. Putting that aside, however, this prosecutorial misconduct is another significant factor to be considered in a cumulative-error analysis. *See* infra ¶¶ 73-77.

2.  Mischaracterized Testimony and Arguing Facts Unsupported by the Evidence

[¶66] In addition to the improper comment on the credibility of Scott, the prosecutor argued facts that were not supported by the evidence and mischaracterized the testimony of a witness.

[¶67] During closing arguments, the State must base "its summation on facts and testimony in evidence and the reasonable inferences that could be drawn therefrom." *See State v. Ardolino,* 1997 ME 141, ¶ 22, 697 A.2d 73. When considering challenges of prosecutorial misconduct involving comments made during closing argument, we review to determine "whether the prosecutor's comment is fairly based on the facts in evidence." *State v. Gould*, 2012 ME 60, ¶ 17, 43 A.3d 952 (quotation marks omitted). "[B]ecause the alleged

misconduct relates to the prosecutor's misrepresentation of facts outside the trial record, we must also look to the prosecutor's obligations as an advocate and officer of the court when evaluating the prosecutor's conduct." *Id.*

[¶68]  Here, the prosecutor argued that Scott went into a room in the house to get a knife and then she went outside and stabbed the victim in the back of the leg as the victim was walking away from her.  Specifically, the prosecutor argued, "Does that tell you that Victoria Scott was so angry after she got shoved down in the driveway that she pulled out the knife, passed that blue bus, and *stabbed [the victim] as [the victim] was walking away*?"  Moreover, the prosecutor argued, "[The witness] said she went into the bedroom and grabbed something.  Did she go in and grab that knife . . . ?"

[¶69]  Although a prosecutor may base a closing argument on reasonable inferences that could be drawn from the evidence, here, there is not a scintilla of evidence in the record that would permit a reasonable inference that Scott went into the bedroom to get her knife and then "followed [the victim] down the driveway and stabbed [the victim as he was walking away]."  Neither Scott's testimony, the medical examiner's testimony, nor any other witness's testimony permitted such an inference.  In its appellate brief, the State

38

conceded that the prosecutor misspoke when he said that a witness testified that Scott had grabbed something when she ran back into the bedroom.

[¶70]  The medical examiner did not render any opinion as to how the knife wounds were inflicted on the victim with regard to the positioning of Scott and the victim.  Although he did testify about a "fifth wound" as being different in orientation from the other cluster of wounds, he did not render any testimony or opinion as to what the location of the "fifth wound" meant with relation to Scott and the victim's relative positions at the time of the stabbing.[13] Nonetheless, the prosecutor argued that this "fifth wound" indicated that Scott stabbed the victim as he was walking away.

[¶71] The prosecutor's argument—that Scott went into the bedroom and grabbed her knife and then stabbed the victim as he was walking away—is extremely prejudicial because it is evidence of premeditation, a fact devastating to Scott's claim of self-defense.  *See State v. Ouellette*, 2012 ME 11, ¶¶ 9-10, 37 A.3d 921 (detailing that self-defense is not available to an individual who is the initial aggressor or has an opportunity to retreat).  The prosecutor's closing argument presented a narrative to the jury that was not supported by the

---

[13]  The only evidence in the record regarding the positioning of Scott and the victim at the time of the stabbing stems from Scott's own testimony and the medical examiner's testimony that it was possible that the cluster of wounds could have been inflicted while the victim was straddling Scott.

evidence. Simply put, the prosecutor's narrative was not based on any evidence; it was an unsupported narrative of what happened. *See State v. Vigue*, 420 A.2d 242, 247 (Me. 1980) ("[T]he prosecutor was, in effect, supplying the jury with additional evidence . . . .").

[¶72] The use of facts not testified to, concerning such an important issue, should be enough to warrant a reversal, and it certainly is a significant factor when considered with the numerous other errors in a cumulative-error analysis. *See* infra ¶¶ 73-77.

C.  Cumulative-Error Analysis

[¶73] "[A] column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993).

> In considering a claim of cumulative error, we look to the impact of a number of variables, such as the nature and number of the errors, their interrelationship, if any, how the [trial] court dealt with the errors as they arose, the length of the trial, and the strength of the government's case.

*United States v. Gonzalez-Melendez*, 594 F.3d 28, 37 (1st Cir. 2010). Although some jurisdictions caution that application of the cumulative-error doctrine should be used sparingly, *see, e.g., State v. Richardson*, 811 S.E.2d 260, 272 n.17 (W. Va. 2018), the present case has a strong foothold in the cumulative-error

doctrine, *see State v. Dolloff*, 2012 ME 130, ¶ 74, 58 A.3d 1032. In this close case, the nature, number, and interrelationship of the errors undermine confidence that Scott received a fair trial. *See Acosta*, 924 F.3d at 307 ("[T]he evidence supporting the convictions, although sufficient, was far from overwhelming.").

[¶74] The credibility of a defendant in a self-defense case is critically important. In this case, there were no eyewitnesses to the stabbing; Scott was the only one who could describe facts that would substantiate her assertion of self-defense. As a result, Scott's credibility was of paramount importance and the central issue in this trial. As the Sixth Circuit recently stated, "[i]n a case where credibility judgments were almost certainly determinative—because all of the government's evidence of guilt was circumstantial—such a comment may have been highly prejudicial." *Acosta*, 924 F.3d at 300.

[¶75] Not only was inadmissible and judicially precluded testimony regarding a past stabbing admitted, but Scott was also referred to as a "very competent and composed liar" in front of the jury by the investigating detective—an improper statement that was reinforced by the prosecutor during his closing argument. The interrelationship between the prejudicial testimony of the detective and the closing remarks by the prosecutor is an important factor in determining the cumulative effect of what could otherwise

be considered harmless error. *See Gonzalez-Melendez*, 594 F.3d at 37. The prosecutor's comments compounded the effect of the earlier testimony provided by the detective. *See Tripp*, 634 A.2d at 1320-21; *cf. State v. Pabon*, 2011 ME 100, ¶¶ 48-49, 28 A.3d 1147 (Silver, J., dissenting). The effect of these improper and prejudicial comments on Scott's credibility cannot be overstated.

[¶76] In addition to the above, the prosecutor's argument as to the sequence of events leading to the stabbing was improper and prejudicial. There is no possible way that the jury could infer from the evidence that Scott went into her bedroom to get her knife and then stabbed the victim in the back of the thigh as the victim was walking away. The prosecution presented a narrative to the jury that was not supported by the evidence in this case.

[¶77] In conclusion, considering the nature of the case and the interrelationship of the testimonial errors and improper prosecutorial remarks, I am unable to conclude that the jury was able to weigh and determine Scott's credibility fairly and independently. *See Acosta*, 924 F.3d at 306-07 ("The improper remarks were not isolated. In a three-day trial, with evidence presented over two days and closing arguments and deliberations taking place on the third, the . . . improper remarks were relatively extensive. *Nor were they confined to one portion of the proceeding.*" (emphasis added)). The cumulative

effect of these plain errors likely had an effect on the outcome of the trial. *See United States v. Pereira*, 848 F.3d 17, 33 (1st Cir. 2017); *Boyd*, 401 A.2d at 161 ("From a review of the record in its totality, we are unable to say beyond a reasonable doubt that the four errors, when considered cumulatively, were harmless."); *State v. Gervais*, 303 A.2d 459, 461-63 (Me. 1973). Standing alone, each of the aforementioned errors could arguably be deemed harmless error, but when all the errors are considered in their totality, it necessitates a conclusion that Scott did not receive a fair trial. Accordingly, we should vacate the conviction.

---

Naomi C. Cohen, Esq. (orally), West Rockport, for appellant Victoria Scott

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2017-338
FOR CLERK REFERENCE ONLY